

AREA OFFICE COPY

## OCEAN SPRAY CRANBERRIES, INC.
## COOPERATIVE MARKETING AGREEMENT
## FOR CRANBERRIES - B POOL

OCEAN SPRAY CRANBERRIES, INC., a cooperative serving producers of agricultural products, incorporated under the General Corporation Law of the State of Delaware (the Cooperative), and the undersigned producer of cranberries (the Grower) agree as follows:

**TERM; RENEWAL; TERMINATION**

1. This Agreement is for an initial term of three (3) years, as specified in Section 16 below, unless earlier terminated in accordance with its terms. The Agreement will renew and continue in force for additional three (3) year terms unless proper notice of termination is given by the Grower or the Cooperative. Such notice of termination must be by delivery of written notice of termination to the other party during the month of December of the third year of the initial contract term or during the month of December of the third year of any succeeding three (3) year term. This Agreement shall terminate on the 1st day of January following the December in which such notice of termination is given.

**ACCEPTANCE; DELIVERY OF CRANBERRIES**

2. (a) During the term of this Agreement, the Grower agrees to deliver to the Cooperative receiving location designated by the Cooperative within the growing area, one hundred percent (100%) of the Grower's annual crop of cranberries produced by the Grower upon the specific cranberry-producing land described in Exhibit B to this Agreement, except cranberries retained for the Grower's personal consumption. The Cooperative agrees to accept those cranberry crops for marketing in an Exhibit B Pool of cranberries as specifically described herein. In the event that the volume of cranberries that may be delivered by Grower or accepted by Cooperative shall be limited by governmental authority, then the parties' obligations hereunder shall remain in full force and effect to the extent that they are consistent with such limitation.

**EXHIBIT B RE-PRESENTATIONS**

(b) The Grower represents that all of the cranberry producing land described in Exhibit B is either owned by the Grower, under contract to purchase by the Grower, or is in the possession of the Grower as tenant. The Grower represents that only cranberries which shall have been produced by the Grower on the land described in Exhibit B will be delivered under this Agreement.

**EXHIBIT A LAND KEPT SEPARATE**

(c) Any of the cranberry producing land described in Exhibit B which abuts cranberry producing land which is outside of Exhibit B must be separated from that land by a dike, road or other topographical feature which results in an easy-to-see physical separation.

**GOOD TITLE**

(d) The Grower represents and warrants that the Grower will have good title to all cranberries delivered and the right and authority to transfer title at the time of their delivery and acceptance. The Grower also represents and warrants that all cranberries will at the time of delivery be free and clear of all liens and encumbrances except those to which the Cooperative has given specific written consent.

**ORDERLY DELIVERIES**

(e) In order to manage the orderly delivery of cranberries to its receiving stations, the Cooperative reserves the right to limit the quantity of cranberries to be delivered by the Grower in any one (1) day.

**PAYMENTS TO GROWER**

3. (a) The net proceeds arising from the sale, in strict accordance with (b) below, of cranberries delivered to the Cooperative, less the necessary marketing and operating expenses, shall be paid to the Grower on the basis of the quantity and the value of the cranberries delivered. Such payments may include incentives as may be provided in the Code-Rules, Procedures and Incentives for the Acceptance and Packing of Cranberries – B Pool (the "B Pool Code"), as may be amended from time to time in the reasonable discretion of the Cooperative. Expenses may include charges and reserves for dividends on preferred and common stock and for any necessary purpose of the Cooperative under its Certificate of Incorporation.

**EXHIBIT B POOL/ NET PROCEEDS**

(b) Cranberries delivered by the Grower hereunder shall be pooled by the Cooperative with cranberries delivered by other growers under similar Cooperative Marketing Agreements For Exhibit B Cranberry Pool. As part of an Exhibit B Pool, Grower understands and agrees that the cranberries delivered hereunder shall be exclusively marketed and sold as value added, commodity cranberry concentrate or commodity frozen whole or sliced cranberries, at the Cooperative's discretion and as consistent with then-current market pricing. The Cooperative shall return to Grower the Grower's proportional share (based on the quantity and value of deliveries) in the net proceeds of the sales of the Exhibit B Pool, as specifically described above. Except as specifically provided herein, the Cooperative shall have no obligations with respect to processing, marketing or sale of such Exhibit B Pool cranberries as or included in value-added products.

**ADVANCES & FINAL PAYMENT**

(c) The Cooperative shall make an initial advance to the Grower upon delivery of its crop in whatever amount may be justified by then current marketing conditions, and shall make additional advances as Exhibit B Pool earnings and marketing conditions justify. Final settlement shall be made as soon as practicable after the close of the Exhibit B Pool of cranberries received from an annual harvest.

  



EXHIBIT ELEVEN (5 PAGES)

-2-



**OVER-DISTRIBUTIONS**

(d) In the event of an overdistribution by the Cooperative to the Grower-Patrons of the Exhibit B Pool, the Cooperative may in its discretion apportion the amount of the overdistribution among the Exhibit B Pool Grower-Patrons on a cooperative basis and may recover the Grower's share of any overdistribution from the Grower through one or more of the following means: (1) Reducing or canceling any approved but undistributed cash payments, retains and/or monies of allocation; (2) Deducting from any amounts due or distributable to Grower from the Cooperative or which the Cooperative is holding in any equity account of the Grower; and (3) Accepting a voluntary cash payment or a voluntary promissory note payable within five years and bearing a reasonable rate of interest not less than that then charged by CoBank, ACB. For purposes of this provision, an overdistribution will be deemed to have occurred whenever final net proceeds are less than the sum of cash advances already paid plus retains (including retains which have been authorized but not actually distributed).

**TAX TREATMENT OF DISTRIBUTIONS**

(e) Any distribution of proceeds payments made in the form of stock per unit retain or any written notice of allocation (as defined in 26 U.S.C. 1388) by the Cooperative to the Grower will be included as income by the Grower at its stated dollar amount or filed with the tax year in which it is received by the Grower, as provided in 26 U.S.C. 1385(a). This provision does not apply to any distributions designated in writing by the Cooperative as "non-qualified."

**QUALITY OF CRANBERRIES**

4.    The Cooperative shall be the judge of grade, quality, color, and any other standards for cranberries deemed appropriate for proper management of the Exhibit B Pool, and may distribute Exhibit B Pool cranberry pool proceeds on the basis of value reflecting quality as well as quantity.  Appropriate charges may be made against the account of the Grower for screening and for processing cranberries which are below standard quality.  If the Grower disagrees with the Cooperative's decision as to grade, quality, color, or other standards, either party may request that the issue be settled by a majority vote of three (3) arbitrators, each of whom shall be a cranberry grower delivering to the Cooperative, one named by each party and the third by the two so named.  Any expenses of arbitration shall be shared equally by the Grower and the Cooperative.

**COOPERATION FROM GROWER**

5.    Whenever requested by the Cooperative, the Grower shall provide, in writing, estimates of its prospective or actual Exhibit B Pool crop, and such other information and advice as the Cooperative may request, including copies of reports delivered or filed with the Cranberry Marketing Committee, as well as information relating to the Grower's Sales History and number of growing acres under the Cranberry Marketing Order (as amended).  By signing this Agreement, the Grower authorizes and directs the Cranberry Marketing Committee to provide to the Cooperative such information as it may from time to time request relative to the Grower's cranberry acreage and production.  At reasonable times, representatives of the Cooperative may enter upon the property controlled by the Grower for the purposes of ascertaining and facilitating the Grower's compliance with the terms of this Agreement.

**COMPLIANCE WITH LAWS, "CODE" AND RULES**

6.    (a) The Grower represents and warrants that as of the time of delivery, all cranberries shall have been grown and delivered in compliance with all federal and state laws and regulations, including, among others, the Federal Food, Drug and Cosmetic Act, the Federal Insecticide, Fungicide and Rodenticide Act, as well as the "B Pool Code" and shall be suitable for sale in interstate commerce.  Without limiting these representations and warranties, or other remedies available to the Cooperative, the Grower specifically agrees that it will not be entitled to any compensation or proceeds for cranberries not complying with the above requirements, and should any advance or payment be made on account of such cranberries, the Grower will promptly refund it upon receipt of notice and request from the Cooperative.

(b) The Grower acknowledges that it has received copies of the Certificate of Incorporation and the By-Laws of the Cooperative, and the "B Pool Code".  The Cooperative agrees to notify the Grower of any amendments to these documents. The Grower agrees to abide by the Certificate, the By-Laws, the "B Pool Code" and all other rules and regulations which may be adopted by the Board of Directors of the Cooperative.

**PROTECTION OF ENVIRONMENT**

7.    The Grower shall follow practices, laws, regulations and rules including those of the Cooperative which protect the environment.  If in the judgment of the Board of Directors of the Cooperative, an unreasonable action or inaction by the Grower has resulted in a failure to protect the environment, the Grower shall be considered to have committed a material breach of this agreement.  Grower and Cooperative agree that a breach of this Section 7 will damage the goodwill and reputation of the Cooperative and that the remedies for breach set forth in Section 10 are reasonable and appropriate.

**EQUITY QUOTA COMMITMENT**

8.    (a)  During the term of this Agreement, Grower agrees to acquire and hold Common Shares of the Cooperative having a par value at least equal to the amount resulting from multiplying the Exhibit B Pool Common Stock Equity Quota by the average of the number of barrels delivered to the Cooperative under this Agreement by the Grower during the three (3) most recent crops delivered under this Agreement.  The Exhibit B Pool Common Stock Equity Quota currently is three dollars and fifty cents ($3.50) per barrel delivered.  The quota may be increased or decreased by the Board of Directors of the Cooperative, and any change shall become effective upon written notice to the Grower.

(b) The share holdings required of the Grower under Subsection (a) of this Section must be reached within eight (8) contract crop years of the Grower's first delivery under this or preceding Exhibit B Pool Marketing Agreements between Grower and Cooperative.

-3-

(e) Common Shares of the Cooperative received by the Grower as stock per unit retains (see Section 9) shall be included in meeting the requirements of Subsection (a) of this Section 8.

(d) In order to assure that the Grower acquires the total number of Common Shares required by Subsection (a), above, by the date specified in Subsection (b), above, the Grower agrees to purchase Shares in annual amounts in accordance with the policy of the Board of Directors as determined and stated from time to time.

(e) The Grower and the Cooperative agree that payment for Common Shares required by Subsection (a) and (d), above, may be met by the Cooperative withholding from the net proceeds of each Exhibit B Pool otherwise payable to the Grower an amount equal to the total par value of the number of Common Shares required to be purchased that year. Such amount withheld shall be in addition to any stock per unit retain made in accordance with Section 9, below.

(f) At the written request of the Cooperative, the Grower agrees to present for redemption at par value any Common Shares of the Cooperative in excess of 100% of the share holdings required under Subsection (a) of this Section 8.

**STOCK RETAIN**

9.   Grower authorizes Cooperative to pay a part of any advance or final Exhibit B Pool payment in the form of a per unit retain. Stock per unit retain payments shall be made in the form of Common Shares of Cooperative unless the Grower holds the total number of such shares required by Section 8(a), above, in which event the payment may be made in cash or in the form of 4% Participating Second Preferred Shares of Cooperative. If the Grower should no longer be qualified to hold Common Shares at the time of payment, any stock retain shall be made in the form of 4% Participating Second Preferred Shares of the Cooperative.

**BREACH:
TERMINATION
HEARING**

10.   In the event of a breach of this Agreement by the Grower, other than non-delivery of cranberries, the Board of Directors may after providing the Grower with an opportunity for a hearing before the Board or a committee of the Board, (a) terminate this Agreement or (b) assess the Grower for any and all costs that the Cooperative may incur in connection with inspecting, testing and monitoring the Grower's compliance with this Agreement and any other costs or assessments deemed appropriate by the Board of Directors. The Cooperative will provide the Grower at least ten (10) business days advance written notice of the time and place of the hearing.

**DAMAGES FOR
FAILURE TO
DELIVER**

11.   The Grower and the Cooperative recognize that it will be impracticable, or extremely difficult, to fix the actual damage to the Cooperative in the event of a breach of this Agreement resulting in non-delivery of cranberries by the Grower. It is expressly agreed and stipulated that in the event of the Grower's failure or refusal to deliver promptly cranberries to the Cooperative, as provided in Section 2(a) of this Agreement, the Grower will pay to the Cooperative an amount equal to fifty percent (50%) of the average Exhibit B Pool net proceeds per barrel for the three (3) prior closed Exhibit B Cranberry Pools (or fewer pools if there have yet to be three (3) prior Exhibit B Cranberry Pools), for each barrel of cranberries not so delivered, as liquidated damages, and not as a penalty, for breach. In addition, Grower agrees that the Cooperative shall be entitled to equitable relief by specific performance or injunction to prevent or remedy any breach or threatened breach of an essential obligation under this Agreement and/or for specific performance of this Agreement according to its terms, without obligation to post bond therefor. The provision of liquidated damages shall not limit the Cooperative's right to equitable relief hereunder. The Cooperative may also terminate this Agreement upon written notice to the Grower as a result of such breach. Any judgment recovered against the Grower in any suit to enforce this Agreement, or any right under it, shall include all costs of Court, and all expenses arising out of or caused by the litigation plus a reasonable attorney's fee. Any sums owed by the Grower to the Cooperative as liquidated damages or otherwise may be deducted from any amounts payable or allocated to the Grower or from any equity or other account of the Grower held by the Cooperative.

**SUCCESSORS
IN INTEREST**

12.   This Agreement may not be assigned or transferred by the Grower and any purported assignment or attempted assignment shall be void and of no effect. This Agreement may be assigned by the Cooperative to any entity or subsidiary controlled by the Cooperative or its Grower-Owners, or to any association, trust, corporation, firm or other form of organization with or into which the Cooperative may be consolidated or merged, or to which all or substantially all of its assets may be sold or transferred.

**CHANGE OF
INTEREST IN
EXHIBIT B LAND**

13.   (a) During the period in a calendar year beginning with the date of completion of the delivery of the crop from the land described in Exhibit B and ending on December 31, any substantive change of interest in any of the land described in Exhibit B which results in the Grower no longer being the producer of cranberries grown on that land, shall release the Grower from the obligation to deliver cranberries produced on that land, except for a non-substantive transfer as provided in Subsection (e) below. Any such change in interest in land must be communicated in writing by the Grower to the Cooperative within thirty (30) days of the change. Where such change of interest affects all of the land described in Exhibit B, this Agreement shall terminate.

(b) During the period in a calendar year beginning on January 1 and ending on the date of completion of the delivery of the crop from Exhibit B, the Grower shall not cause or permit any substantive change of interest in any land specified in Exhibit B which results in the Grower no longer being the producer of cranberries grown on that land. This prohibition does

-4-



not apply to such a change of interest in land where: (i) the crop of cranberries for the current calendar year from the affected land described in Exhibit B will be delivered to the Cooperative on behalf of the Grower and, (ii) the Cooperative may pay the proceeds arising from the delivery to the Grower. In the event cranberries are not delivered as provided in this Subsection, the Grower shall be obligated to the Cooperative for the remedies as provided in Section 11. Where such change of interest affects all of the land described in Exhibit B, this Agreement shall terminate upon delivery of the current year's crop.

(c) For the purpose of this Section 13, a non-substantive transfer of any interest in land shall be considered, in the Cooperative's sole discretion, to be any change of interest which is a mere change of form and does not result in an effective and complete transfer of the grower's entire actual or beneficial ownership, control, title or interest in the acreage described in Exhibit B. A non-substantive transfer of any interest in land used for the production of cranberries under this Agreement may be made any time with the prior written consent of the Cooperative.

**ADDITIONAL EXHIBIT B POOL RIGHTS**

14.    (a) Grower shall be eligible to participate in the Cooperative's Planting Grant Program to add newly planted acres as Exhibit A acres under the Cooperative's traditional, Exhibit A, Cooperative Marketing Agreement for Cranberries in accordance with the current Acreage Growth Policies as established and revised from time to time by the Board in its reasonable discretion. Notwithstanding the above, Grower shall not be able to use the land described as Exhibit B hereunder in connection with such Planting Grant Program.

(b) After the first delivery of cranberries to the Cooperative hereunder, Grower shall be eligible to participate in an Exhibit A Acreage Delivery Auction as may be held by the Cooperative in efforts to convert all or part of the land described as Exhibit B hereunder to Exhibit A land under the Cooperative's traditional Exhibit A Cooperative Marketing Agreement for Cranberries. Such Acreage Delivery Auction shall be held in accordance with the current Acreage Growth and Acreage Delivery Auction Policies as established and revised from time to time by the Board in its reasonable discretion.

**CHANGE IN CONTROL**

15.    In the event the Grower is other than a natural person, no change shall be made in its legal structure, and no Transfer shall be made of any of its stock, shares of interest or other indication of ownership which would result in an effective transfer of control without the prior written consent of the Cooperative which shall not be unreasonably withheld. The Cooperative reserves the right to terminate this Agreement at will if the Grower fails to give the Cooperative prior written notice of such a change or transfer.

**INITIAL TERM**

16.    The initial three (3) year term of this Agreement shall be the period beginning September 1, 200_____ and ending August 31, 201_____ unless earlier terminated in accordance with the terms of this Agreement.

**TAX INFORMATION**

17.    For purposes of reporting to the U.S. Internal Revenue Service, the Grower certifies under penalties of perjury that the information provided below as to the Grower's name, address, and Social Security number or Employer Identification Number is true, correct, and complete.

**MISCELLANEOUS**

18. Titles of the sections of this Agreement are supplied only for convenience and are not to be construed as part of the Agreement. This Agreement shall be deemed to have been made in the Commonwealth of Massachusetts and shall be interpreted under the laws of that state.

**NOTICES**

19.    All notices required hereunder shall be deemed effective if in writing and sent by a recognized overnight delivery service and/or by Certified Mail, Return Receipt Requested to the Grower's address as it appears on the records of the Cooperative, or to Cooperative Headquarters at One Ocean Spray Drive, Lakeville MA 02349. Grower agrees to notify the Cooperative of any change of address.

**SURVIVING TERMS**

20.    The obligations set forth in the provisions of Sections 2(b) 2(d) 3, 4, 6, 7, 9 10, 11 and 17 shall survive termination or expiration of this Agreement.

IN WITNESS of their mutual consent to the above provisions, Grower and Cooperative have executed this Agreement.

_____

Print name(s) of Grower or Company Name of Grower



_____

Signature of Grower or Authorized Officer*            Social Security or Employer Identification Number*

_____

Signature of Grower (if more than one)*            Social Security or Employer Identification Number*

-5-

Post Office Address of Grower (Please Print or Type)

OCEAN SPRAY CRANBERRIES, INC.

Accepted at Lakeville-Middleboro, Massachusetts

Date:_____

By:_____
    *Authorized Signature*
_____

\*Where the Grower is a natural person or persons, or a partnership, each grower or general partner must sign this Agreement and supply their respective Social Security Number(s) or the partnership's Employer Identification Number.  Where the Grower is a corporation, trust, executor or limited liability company, an authorized officer or person must sign this Agreement and supply the relevant Employer Identification Number.

Cranberry CMA – B Pool
2006

3-16-11 Grower Letter Attachment

## State of the Business

*Remarks by CEO Randy C. Papadellis*
*2011 Ocean Spray Annual Meeting*
*Wednesday, March 9, 2011*
*San Diego, California*

Good Morning! I'd like to welcome you all to the 81st Annual Meeting of Ocean Spray.

A lot has happened over the last 80 years in this Cooperative. But let me first assure you all that your Cooperative is as strong today as it has ever been, and we continue to be well positioned for future growth and success.

I'm not big on dwelling in the past, but it is important to recognize that we have had ten consecutive pools of increasing returns for our "A" Pool and ten consecutive years of increasing cranberry fruit demand for our branded business as well.

Our grapefruit growers have enjoyed returns that in most years over delivered versus the cash market.

Allow me to thank all of our Growers for putting their faith in us ... by us I mean the management team at Ocean Spray ... it would have been easy for many of you to abandon the Coop at times in the last ten years, but you put your faith in us and for that I am especially appreciative.

Yet, in order to continue these remarkable trends and capitalize on the opportunities ahead, we will face hurdles that are new to us and that will require us to be unique and flexible as to how we all approach the business.

Several weeks ago, I along with several members of management and the Board attended the National Council of Farmer Cooperatives national meeting; a wonderful opportunity to network with other cooperative peers from around the country. I was hoping that we could learn how other successful coops were dealing with some of the hurdles we are now facing and to which I will speak to in a moment.

Unfortunately, there was no magic answer to be learned as the more advanced cooperatives were struggling with the very same issues as us, while many other coops were even unaware of the hurdles that were going to be coming at them.

The simple fact is that most agricultural cooperatives are preoccupied only with the supply side of economics ... not surprising it's the only thing farmers can directly control. We have a huge advantage in our large successful branded business so we have a demand-generation tool unavailable to most other coops.

Many of our cooperative peers are looking to Ocean Spray and our demonstrated success for ideas. So, what are some of the hurdles we will be facing .....?

They involve dealing with a whole new set of business regulations coming from federal, state, and even international governing bodies as well as a global economic climate that is confounding not only us but also some of the world's leading economists as well. We also face the additional hurdles of how we are going to continue to finance the growth of our business.

(SEE NEXT PAGE)

3-16-11 Grower Letter Attachment

All of this I will address in a moment but, before we go there, I'd like to provide a quick recap on the performance of our business. Rick will be up here in a moment to provide a more detailed financial update ... but I am pleased to let you know that the 2009 Cranberry "A" Pool closed in February ... and, although the accounting is not yet complete, we expect to surpass the $64 per-barrel target we have been working against by at least a $1 per barrel if not a little more. 

I'd like to pause for a minute to simply remind us all of how the "A" Pool return is composed ... Embedded in the return is the commodity value of the fruit your farm delivered to the Cooperative ... which for this Pool was probably around $25 per barrel ... the remaining $40 or so per barrel is the dividend from your investment in the Ocean Spray brand.

If you took that $40 and multiplied it by the number of barrels delivered in total, you could approximate a branded company profit margin ... this margin, compared to other CPG companies as measured by the Grocery Manufacturers Association, is a good margin especially over the last year but certainly not best in class ... at least not yet.

As cranberry handlers, we are doing quite well but, compared to top-tier CPG companies, I believe we still need to make some progress. Though, I am very pleased the Ocean Spray brand continues to provide you with an excellent return on investment and protection from the wild swings of the cranberry commodity markets ... in my opinion, our profit margin can and should be higher and we will continue to strive to improve regardless of the price of commodity cranberries but we will need your help ... we will need to invest to make it happen.

For the immediate future, though, the Board and management have aligned around a strategy to increase branded fruit demand at a higher than historical rate with the cost to us being smaller increases in overall "A" Pool returns. We believe that continuing our strong growth in branded fruit demand is in the best interest of Ocean Spray and our industry. Consequently, our projection for the 2010 "A" Pool is $65 per barrel, but we hope to increase "A" Pool fruit utilization by several hundred thousand barrels by pursuing new innovation, new trade channels and markets many of which we reviewed with you yesterday.

For those of you with acreage in the Cranberry "B" Pool....the 2009 "B" Pool closed in January with a return of $26.37 per barrel on fruit with average brix. Many higher brix growers received more than $30 per barrel. The 2010 "B" Pool is currently projected to close next January ... making it a 12-month pool with a return in the range of $15-$20 per barrel for fruit with average brix.  

We believe this is somewhat of a conservative projection as it is based on cranberry commodity pricing around where it is today. If we continue to see improvements in cranberry commodity pricing there could be a little upside to this number.

The 34th Citrus Pool is projected to close in May at the targeted return of $1.50 per fsp. The 35th Pool which is the crop we are harvesting right now is also projected at $1.50 per fsp but on significantly higher fruit utilization stemming from a USDA Grapefruit Juice bid we were able to secure. We continue to execute against a Long-Range Citrus plan that increases fruit utilization over time while delivering a consistent return around a $1.50 per fsp.

Again, Rick will provide more financial information in a moment ... As I mentioned at the outset, challenges from forces outside our direct control remain the largest external threat to today's business ... while the financing of the growth will be our largest internal challenge.

I know many of us in this room are often pre-occupied with what we like to call the cranberry economy ... barn meetings and coffee-shop talk often are centered around things like the Cranberry Marketing