# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

Barry K. Winters d/b/a BKW Farms,
Stacy Preston Winters,
Paul D. Sogn and Rachelle D. Sogn d/b/a
Wintersogn Farm, LLC,
Michael A. Webb,
Rickard W. Jackson,
Jackson Farms, Inc.,
James M. Schaer,
Julie A Schaer,
Scott R. Vierck,
Fred P. Bussmann,
John L. Meyer,
John L. Meyer Cranberries, Inc.,
Christian M. Bussmann, and
Deanna M. Bussmann, ,
Charles V. Goldsworthy and Timothy R.
Goldsworthy d/b/a ThunderLake-Tomahawk
Cranberries, Inc., and
H.E. Querry, Inc.on behalf of themselves and
all others similarly situated as a class,

**C.A. . 1:12-CV-12016-RWZ**

**Date: March 1, 2013**

                                    Plaintiffs,

            v.

Ocean Spray Cranberries, Inc., an agricultural
cooperative, and
Ocean Spray Brands, LLC, a limited liability
company,

                        Defendants.


## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs, through their attorneys, bring this civil action on behalf of themselves and all

others similarly situated for damages, injunctions and declaratory relief under the antitrust and

agricultural laws of the United States the Federal Rules of Civil Procedure and Massachusetts

General Laws, c.93A.

## **INTRODUCTION**

This case arises out of Defendants' pattern of illegally fixing the price of cranberry juice concentrate and discriminating against certain members of Ocean Spray's own agricultural cooperative, known as the "B Pool" of cranberry growers. Defendants engaged in these illegal activities in order (1) to unlawfully increase the revenues of the favored "A Pool" of cranberry growers at the expense of Ocean Spray's "B Pool" growers; (2) to prevent its grower members from leaving Ocean Spray's cooperative in search of a fairer price for their crop; and (3) to force independent growers either to go out of business or to become members of Ocean Spray's cooperative. Defendants' constant need for more cranberries to supply the increasing demand for the Ocean Spray brand products (such as Ocean Spray cranberry juice and Craisins®) led Defendants to unlawfully suppress the market price of cranberries grown both by independent growers and by Ocean Spray's own "B Pool" of cranberry growers.

Defendants accomplished their illegal scheme, in part, by creating a second-class membership within the cooperative, the "B Pool," and discriminating against them by returning a lower value for their fruit than that received by the dominant and controlling members of the cooperative, the "A Pool." Ocean Spray's discrimination of the "B Pool" violates a 1957 Final Judgment prohibiting the cooperative from discriminating in the pooling of cranberries, as well as the Capper-Volstead Act's requirement that the cooperative operate for the "mutual benefit of the members." Ocean Spray sells the lower valued "B Pool" fruit in an on-line auction in the form of cranberry concentrate. The auction is a sham; it is nothing more than a guise for Ocean Spray to predatorily set cranberry prices below the cost of production. Ocean Spray dictates the

2

quantity of concentrate any one bidder is allowed to bid on and otherwise sets up the auction to eliminate competition among the purported bidders and create disincentives to bidding. The price Ocean Spray sets for cranberry concentrate at the auction establishes the prices independent growers receive for their fruit. In addition to violating the 1957 Final Judgment and the Capper-Volstead Act, Defendants' actions also violate 7 U.S.C. § 291, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and M.G.L. c. 93 a, § 11.

The Plaintiffs and other members of the plaintiff classes have suffered severe harms as a result of Defendants' illegal scheme. Absent Defendants' unlawful discrimination, members of Ocean Spray's A Pool and B Pool would earn similar returns on their cranberries. Further, in an unrestrained market, independent growers, being more efficient producers, would earn higher returns on their cranberries than those earned by the members of Ocean Spray's cooperative. As a result, some cranberry growers, seeking higher returns for their fruit, would leave Ocean Spray and become independent growers. Consequently, Ocean Spray would lose market dominance over the cranberry fruit market and branded product market, and would be forced to relinquish a portion of its business. However, Ocean Spray exercised its monopoly and monopsony power over the price of cranberries to predatorily set prices received by independent growers and the "B Pool" at a price below the cost of production. This price-fixing has solidified the Defendants' market dominance, discouraging the "B Pool" growers from leaving the cooperative, and leaving independent growers with no choice but to either exit the cranberry market altogether or to join Ocean Spray at a significant financial disadvantage as members of its disfavored and underpaid "B Pool."

**JURISDICTION AND VENUE**

1.      This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; an Order of this Court in Case Number 55-418-3 (the "Final Judgment"); the Capper-Volstead Act, 7 U.S.C. § 291; and Federal Rule of Civil Procedure 71 (Enforcement of a court Order by a non-party).

2.      This court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.

3.      This court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims arising under Massachusetts General Laws, Chapter 93A and Massachusetts state antitrust laws because the actions complained of herein all originated at the corporate headquarters of Ocean Spray Cranberries, Inc. and Ocean Spray Brands, LLC located in Lakeville/Middleborough, Massachusetts.

4.      This court has personal jurisdiction over all of the parties under 28 U.S.C. § 1332.

5.      Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants inhabit, transact business, or reside in this District and the actions complained of herein all originated at the corporate headquarters of Ocean Spray Cranberries, Inc. and Ocean Spray Brands, LLC located in Lakeville/Middleborough, Massachusetts.

6.      The illegal activities described in this Complaint are in and substantially affect interstate and foreign commerce. Ocean Spray processes and ships fresh cranberries, cranberry concentrate, cranberry bottled juice drinks, sweetened dried cranberries and other cranberry products across state lines.  Ocean Spray Cranberries, Inc. and Ocean Spray Brands, LLC also

receive substantial payments across state lines from the sale of cranberries and cranberry products.

## THE PARTIES

7.      Plaintiffs Rickard W. Jackson and Jackson Farms, Inc., James M. Schaer, Julie A Schaer, Scott R. Vierck, Fred P. Bussmann, John L. Meyer, John L. Meyer Cranberries, Inc., Christian M. Bussmann, Deanna M. Bussmann, Timothy R. Goldsworthy and Charles V. Goldsworthy d/b/a Thunderlake-Tomahawk Cranberries, Inc. and d/b/a/ H.E. Querry, Inc., and the class they represent are all independent cranberry growers (collectively, the "Independent Growers" or the "Independent Growers Class") who are not members of Ocean Spray Cranberries, Inc. and are located in Massachusetts, New Jersey, Wisconsin, Oregon, Washington, Michigan, Canada, or Chile.

8.      Plaintiffs Barry K. Winters d/b/a BKW Farms, Stacy Preston Winters, Paul D. Sogn and Rachelle D. Sogn d/b/a Wintersogn Farm, LLC, Michael A. Webb, and the class they represent are B Pool members of Ocean Spray Cranberries, Inc. (collectively, the "B Pool" or the "B Pool Class") and are located in Massachusetts, New Jersey, Wisconsin, Oregon, Washington, Michigan, Canada, or Chile.

9.      Defendant Ocean Spray Cranberries, Inc. ("Ocean Spray" or the "Cooperative") is a Delaware corporation, with its principal place of business in Lakeville/Middleborough, Massachusetts. Ocean Spray is an agricultural cooperative with more than 700 cranberry grower members located in the United States, Canada, and Chile, and nearly 50 grapefruit grower members located in Florida. Ocean Spray is North America's leading producer of sweetened dried cranberries and cranberry juice drinks, and has been the best-selling brand name in the

canned and bottled juice category since 1981. Ocean Spray posted fiscal 2010 sales of over $2.0 billion. Ocean Spray does business throughout the United States, Canada, and Chile. *See* **Exhibit One**.

10.     Defendant Ocean Spray Brands, LLC ("Ocean Spray Brands") is a wholly-owned subsidiary of Ocean Spray with all of its shares owned by the parent, Ocean Spray. The Board of Directors and the executive management of Ocean Spray Brands are identical to those of Ocean Spray. Ocean Spray Brands was established in 2008 and began operations on March 1, 2009. Ocean Spray Brands does business throughout the United States, Canada, and Chile. *See* **Exhibit Two**.[1]

## CLASS ACTION ALLEGATIONS

11.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs.

12.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis.

13.     Plaintiffs' proposed Independent Grower Class is defined under Rule 23(b)(2) and (3) as:

> All cranberry growers, whether individuals, entities or members of cooperatives, who were not members of Ocean Spray during any time beginning January 1, 2008.

14.     Plaintiffs' proposed B Pool Grower Class is defined under Rule 23(b)(2) and (3) as:

> All cranberry growers, whether individuals, entities or members of cooperatives, who were members of Ocean Spray's B Pool or who had acreage in Ocean Spray's B Pool during any time beginning

---

[1] Some exhibits attached to the Complaint have been redacted to protect Defendants' proprietary information.

January 1, 2008.

15.     At all times relevant to this Complaint, there are more than 300 members of the proposed classes residing in more than 6 states and in Canada and Chile. Based upon the wide geographic location of the purported class members involved in this action and the large total number of class members, joinder of the claims of all Class members would be impracticable.

16.     Plaintiff's claims are typical of the claims of each class because all Plaintiffs suffered injury to their business or property caused by the same illegal and anticompetitive conduct of Defendants, including but not limited to violating the Final Judgment and Capper-Volstead Act, fixing the price of cranberry concentrate, and discriminating against cranberry growers who were not in Ocean Spray's "A" Pool.

17.     Plaintiffs will fairly and adequately protect the interests of each class because Plaintiffs have no relevant conflicts of interest with other members of the class, and have retained qualified and experienced counsel capable of vigorous representation in class action and antitrust litigation.

18.     Questions of law or fact common to the members of both proposed classes predominate over any questions affecting only individual proposed members. These common questions of law and fact include, but are not limited to, the following:

(a)     Whether Defendants engaged in conduct with respect to Plaintiffs that violates the Final Judgment, including discriminating against the Cooperative's B Pool by paying them less than the A Pool members for the same quality of fruit;

(b)     Whether Defendants engaged in conduct with respect to Plaintiffs that violates the Capper-Volstead Act, 7 U.S.C. § 291, including operating the Association in a way that does not mutually benefit all members but, rather, discriminates in favor of A Pool members at the expense of B pool members;

(c)    Whether Defendants engaged in conduct that violates 15 U.S.C. §§ 1 and 2, including willfully and purposefully engaging in a pattern of anti-competitive conduct in an attempt to monopolize and monopsonize the cranberry market by fixing the prices of fresh, frozen and processed cranberries to harm the Plaintiffs;

(d)    Whether Defendants engaged in conduct that violates M.G.L. c. 93A, §§ 2 and 11;

(e)    The existence, duration, and illegality of the conduct alleged herein;

(f)    Whether Defendants caused injury to Plaintiffs and the proposed class members; and

(g)    Whether Plaintiffs and the proposed class members are entitled to:

    (i)    an injunction prohibiting the continuation of Defendants' violations, and an order that such other and further injunctive relief is necessary to restore competition;

    (ii)    an award of damages and other monetary relief, including treble damages;

    (iii)    interest from the date they should have received all monies rightfully owed to the actual date of payment as a result of this lawsuit; and

    (iv)    attorneys' fees and costs and any other relief this Court deems just and reasonable.

19.    A class action is a superior method for the fair and efficient adjudication of the controversy described herein. The class action vehicle provides a more efficient method for the enforcement of Plaintiffs' rights than individual adjudications, and class action litigation can be managed fairly and efficiently. Plaintiffs know of no unusual problems of management and notice with respect to the proposed classes.

20.    The benefits of the class action procedure, including but not limited to providing claimants with a superior method for the redress of their claims, far outweigh any difficulties that may exist in the management of the class action.

21.     Individual litigation of hundreds of similar cases would unduly burden the courts. Individual litigation would further present a potential for inconsistent or contradictory judgments, and would increase the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties and provides the benefit of single adjudication under the comprehensive supervision of a single court. Notice of pendency of the action and any resolution thereof can be provided to proposed class members by publication and/or other means.

**OCEAN SPRAY VIOLATES**
**THE FINAL JUDGMENT AND THE CAPPER-VOLSTEAD ACT**

22.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs.

23.     In 1957 Ocean Spray's predecessor corporation, National Cranberry Association, agreed to a Final Judgment, attached hereto as **Exhibit Three**, in a case brought against it by the United States Department of Justice. In that case, the DOJ charged Ocean Spray with monopolizing interstate trade and commerce in cranberry products in violation of sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2). The DOJ sought entry of the Final Judgment since the defendants, including Ocean Spray, "are continuing and will continue said offenses unless the relief hereinafter prayed for is granted." *See* Complaint filed in this Court in Case Number 55-418-3.

24.     In the Final Judgment, Ocean Spray agreed that it would be enjoined and would refrain from

> receiving from any person not a member of [its cooperative] for marketing any cranberries except on the same terms or conditions as to payment therefore as would apply if such person were a

> member . . . .

*Id*, at § IV(F)(1).

    25.    Ocean Spray further agreed that it would be enjoined and would refrain from

> [d]iscriminating among members in the administration of any
> pooling of cranberries . . . .

*Id*, at § IV(F)(2).

    26.    Independent growers sell substantially all of their cranberries to processors who make cranberry juice concentrate from them and then make cranberry juice from the concentrate in competition with Defendants.

    27.    The difference in compensating the A and B Pools results in significantly different payments to each Pool.  **Chart 1** below shows the average payment received by independent growers and the B Pool compared to the A Pool for the years 2006 to 2011, Defendant's discriminatory conduct against the B Pool and violation of the Final Judgment. The information relating to the A and B Pools was taken from Ocean Spray's corporate documents distributed to the Cooperative's members. *See* **Exhibits Four, Five, and Six**.  Independent growers do not all receive the same amount for their crop; however, the prices they receive for their fruit are dependent on the prices of cranberry concentrate as set by Ocean Spray and similar to the prices received by the B Pool.   The figures in **Chart 1** are based on average receipts, per barrel. They are presented to show the trend in the industry as a whole, and the changes that occurred in 2009 because of Ocean Spray's discriminatory conduct against the B Pool and violations of the Final Judgment and Capper-Volstead Act.

**CHART 1**
(Receipts per barrel in $)

| | INDEPENDENT GROWERS | | OCEAN SPRAY'S GROWER | |
|---|---|---|---|---|
| | Oregon | Wisconsin and Massachusetts | A Pool | B Pool |
| 2006 | 50.00 | 40.00 | 47.69 | 32.93 |
| 2007 | 65.00 | 50.00 | 54.75 | 68.85 |
| 2008 | 63.50 | 70.00 | 60.00 | 52.60 |
| 2009 | 16.00 | 37.00 | 64.00 | 26.37 |
| 2010 | 15.00 | 18.00 | 63.11 | 18.56 |
| 2011 | 33.00 | 26.00 | 60.00 | 28.50 |

28.      Ocean Spray is violating the Final Judgment, which is still in effect today, by discriminating against the Cooperative's B Pool and paying them less for their cranberry fruit than what is received by the Cooperative's A Pool.

29.      The average price of cranberry juice concentrate per gallon is shown in **Chart 2** below.  Not everyone receives the same amount.  These figures are presented here to show the trend in the industry as a whole and the resulting drop in prices after 2009:

**CHART 2**
(Receipts per barrel in $)

| | |
|---|---|
| 2008 | 53.63 |
| 2009 | 57.10 |
| 2010 | 27.26 |
| 2011 | 18.79 |
| 2012 | 24.25 |

30.      The helpless members of the B Pool must accept for their crop whatever Ocean Spray decides to pay them.  **Chart 1**.

31.    Ocean Spray also is violating the Capper-Volstead Act, 7 U.S.C. § 291, which authorizes the formation of agricultural cooperatives such as Ocean Spray,

> [p]rovided, however, that such associations are operated for the mutual benefit of the members thereof.

32.    As shown in **Chart 1** above, Ocean Spray is not operating for the mutual benefit of the B Pool, but rather to the detriment of the B Pool so that the A Pool can obtain higher returns.

33.    Although Ocean Spray Cranberries has not complied with the "mutual benefit" requirement of the Capper-Volstead Act, the Cooperative has nonetheless benefited from the Act and wrongfully asserts that it is entitled to the protections the Act affords.

34.    During 2007 and 2008 the Chairman of Defendants' Board of Directors was very concerned about the greater prices being received by independent growers compared with Ocean Spray's growers.  *See* **Exhibit Seven**.

35.    During 2007 and 2008 the Chairman of Defendants' Board of Directors was also very concerned about Ocean Spray's growers who left Ocean Spray's Cooperative because they could get more money for their cranberries as independent growers.  *See* ***Id***.

36.    During 2007 and 2008 Defendants' President was also greatly concerned about not having enough cranberries to meet Defendants' needs in the future.  *See* **Exhibit Eight**.

## OCEAN SPRAY'S ANTICOMPETITIVE AND PREDATORY CONDUCT

12

37.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs.

38.     Plaintiffs' antitrust claims arise out of Defendants' illegal price-fixing of cranberry concentrate and predatory tactics to eliminate competition in the cranberry market.

39.     Defendants illegal schemes were accomplished by:

    (a)     Discriminating against and disadvantaging the B Pool in order to give the A Pool and Ocean Spray Brands higher returns on the Ocean Spray branded products in contravention of the Final Judgment and the Capper-Volstead Act;

    (b)     Purchasing cranberry fruit from independent growers that are not members of the Cooperative on terms and conditions different from the Cooperative's A Pool, in contravention of the Final Judgment (the "Cranberries Limited Fruit"); and

    (c)     As set forth in more detail below, selling a portion of the B Pool fruit and Cranberries Limited Fruit in sham "auctions" of cranberry concentrate in order to fix the price of all fresh, frozen, and processed cranberries significantly lower than the market price and, eventually, below the cost of production which averages nationally at $35 per barrel.

**Ocean Spray Discriminates against the B Pool**

40.     As set forth in more detail below, Ocean Spray discriminates and implements policies that disadvantage a select group of the Cooperative's growers, called the "B Pool," in violation of a 1957 Final Judgment and the Capper-Volstead Act.

41.     Historically, all Ocean Spray growers earned returns on their crop based on the returns from sales of Ocean Spray's branded products, including Craisins® and Ocean Spray brand juices. The amount the growers traditionally received was proportionate to the volume of fruit delivered to the Cooperative, less administrative and sales expenses. *See* **Exhibit Nine**.

42.     In early 2006, Ocean Spray created two classes of growers within the Cooperative:  the A Pool and the B Pool.  The Cooperative pays the A Pool based on the sales

and profitability of the Ocean Spray branded products, such as Craisins® and Ocean Spray brand juices (often called "value-added products"). The Cooperative pays the B Pool based on the price of processed cranberries sold to industrial buyers like Kellogg's, General Mills and Pepsi; payment to the B Pool is based on the commodity price of cranberries (also called "non-value added, commodity cranberries"). *See* **Exhibit Ten** at pages 3-4; **Exhibit Eleven** at ¶ 3(b).

43.     As Randy Papadellis, the CEO and President of Ocean Spray, stated in 2008, the Board created the B Pool to "track the pricing of the cranberry commodity market" which is "disconnected from the Ocean Spray branded business and simply offers the average return of the cranberry commodity business." **Exhibit Ten**, Remarks by CEO Randy C. Papadellis, 2008 Ocean Spray Annual Meeting, page 4 (a document distributed by Ocean Spray to its members to inform them of the State of the Business). The A Pool "ride[s] the wave of success" of Ocean Spray's "successful consumer business … a success [Ocean Spray] [is] working very hard to continue and build upon well into the future." *Id.* at page 3.  The A Pool's returns "reflect[] the strong profitability of [Ocean Spray's] branded business" and the A Pool is "well isolated from the collapse in the commodity prices." *Id.* at pages 3-4.

44.     The way Ocean Spray structured the payments between the two Pools creates a conflicting incentive structure between members of the two Pools. In order for the A Pool to receive higher returns on the branded products sold to consumers, the A Pool needs the prices of ingredients of the branded products – specifically, cranberries – to be low. The B Pool, however, wants the highest and best price they can obtain for their fruit, but getting the highest and best price in an unrestrained market would result in the A Pool receiving lower returns on the branded products.  Ocean Spray is not acting for the mutual benefit of all its members.

45.     There is no difference in quality between A Pool fruit and B Pool fruit. If the A Pool is short on fruit, the Cooperative takes fruit from the B Pool and moves it to the A Pool for use in the Ocean Spray branded products. *See **id.*** at page 3; **Exhibit Twelve** at ¶ 3(b).  The only reason given for creating the B Pool and A Pool was to provide the respective pool members with different compensation. *See **Exhibit Eleven*** at pages 3-4.

46.     The B Pool consists of former independent growers, including former Ocean Spray growers or former Ocean Spray acreages that desire to return to the Cooperative. Under the rules established by Ocean Spray's Board of Directors (the "Board"), any cranberry growers joining Ocean Spray must join as B Pool growers, and not as A Pool growers. The Board limits the number of acres and growers allowed into the A Pool, and the Board, consisting solely of A Pool growers, determines the policies setting forth which B Pool members, if any, can join the A Pool.

47.     As shown in **Chart 1**, Ocean Spray has discriminated against and harmed the B Pool in order to confer larger benefits (in the form of higher payments) on the A Pool.  This conduct violates a 1957 Final Judgment and the Capper-Volstead Act.

48.     The Cooperative's B Pool has no say regarding how their fruit is used or the price at which it is sold or what the Cooperative pays them for their fruit. *See **Exhibit Eleven*** at ¶ 3(b) (B Pool fruit is "exclusively marketed and sold…at the Cooperative's discretion").

49.     Defendants accomplished their illegal monopolistic and monopsonistic conduct in two ways. First, Defendants engaged in a conspiracy with their Board (including but not limited to the individuals identified in ¶ 76 below) and Management (including but not limited to the individuals identified in ¶ 77 below) to fix the price of all fresh, frozen, and processed

cranberries in order to obtain greater value for the Ocean Spray branded products, rather than obtaining the highest and best price for the fruit of all members of the Cooperative. Second, Ocean Spray engaged in anticompetitive and predatory pricing and tactics to eliminate grower competition in the cranberry market which forces independent growers to either join the B Pool or to exit the cranberry market altogether.

50.     The Defendants' illegal and anticompetitive schemes have been and continue to be successful. The prices received by independent growers and the B Pool decreased following the Defendants' implementation of their anticompetitive schemes in 2009.   **Chart 1** shows the average amount per barrel of cranberries received by the independent growers and the B Pool compared to the A Pool. It shows the prices received before and after the Defendants began their illegal and anticompetitive schemes.

51.     The average price of cranberry juice concentrate per gallon is shown in **Chart 2** below.   **Chart 2** shows the prices received by Ocean Spray and paid by consumer packaged goods manufacturers (such as Gerber, Kellogg's and General Mills) before and after the Defendants began their illegal schemes.

**Ocean   Spray's Illegal Schemes Harm Independent Growers, B  Pool  Members  and  Consumers**

52.     Before Defendants began their illegal schemes, independent cranberry handlers and processers and some consumer packaged goods manufacturers would purchase their cranberry fruit from independent growers. Following Defendants' illegal schemes, independent cranberry handlers and processers and the consumer packaged goods manufacturers terminated their supply agreements with the independent cranberry growers, and instead turned to Ocean Spray to supply their cranberry needs because Ocean Spray set a price at less than one-half of

what it was before.  Even though Ocean Spray competed with these independent handlers and processers and the consumer packaged goods manufacturers, Ocean Spray supplied these competitors with cranberries and cranberry concentrate at prices lower than what Ocean Spray could have obtained and at prices lower than existed at that time in the unrestrained market.  The only parties harmed by this economically unsound policy were the B Pool and the independent growers.

53.     Independent growers who cannot or will not join Ocean Spray are forced either to sell cranberries below the cost of production or to exit the cranberry market.  When the independent growers are forced out of the market, Ocean Spray or the A Pool members may in turn purchase the independent growers' cranberry bogs at prices far below the value that would have existed in the absence of Defendants' illegal tactics.

54.     In addition, Defendants' illegal tactics forced some independent growers to join the Cooperative as B Pool members.  During his "State of the Business" speech in February 2009, Randy Papadellis, CEO of Ocean Spray, announced that Ocean Spray had "lost 29 points of crop share in the last 20 years."  **Exhibit Thirteen**.  He ominously predicted that, if "that trend continues, we are out of business."  ***Id.***   At the conclusion of 2009 (the first year of the illegal price-fixing), Ocean Spray added 80 new grower-members to the Cooperative.  **Fourteen**. The anticompetitive schemes also prevented B Pool members from leaving the Cooperative.  At the same time, Ocean Spray experienced no membership loss.  ***Id.***

55.     Consumers have not benefited from the lower prices of cranberries.  Defendants have not passed the lower prices of cranberries on to consumers by reducing the prices of Ocean Spray's branded products.  Furthermore, despite the lower prices, Defendants have decreased –

not increased – the cranberry content of the Ocean Spray branded products, thereby lowering the products' quality.

56.     Defendants' illegal schemes have allowed Ocean Spray to achieve or maintain a monopoly and monopsony in the cranberry market, and to suppress the price of cranberries received by all members of the Independent Growers Class and the B Pool Class.

**The Relevant Markets**

57.     The relevant geographic market in this action is the United States, Canada, and Chile, which are the locations of the bogs owned and operated by independent growers and Ocean Spray's cooperative members, and are all of the areas where cranberries are grown.

58.     The relevant product market in this action consists of the market for fresh, frozen and processed cranberries, including cranberry concentrate grown and sold in the United States, Canada, and Chile.

59.     There are no reasonable substitutes for cranberries. Cranberries are a distinctive fruit with unique health benefits. They have a uniquely tart and acidic taste that is difficult, if not impossible, to achieve with other fruits. Cranberries naturally lack sugar, making them desirable as a flavoring ingredient in low-calorie foods. And they have been shown to protect against urinary tract infections, inhibit the growth of E. coli and other bacteria, and provide other health benefits. For all of these reasons, purchasers of cranberry products cannot reasonably substitute other fruits for cranberries.

60.     There are two distinct uses for cranberries: fresh and processed. Fresh fruit usage is small.   Processed fruit usage accounts for most cranberry usage. Most cranberries are

processed into juice concentrate for fruit beverage drinks. Cranberries are also processed into sweetened dried cranberries ("SDC").

61.     Independent growers sell substantially all of their cranberries to processors who make cranberry juice concentrate or SDC in competition with Ocean Spray.

62.     Ocean Spray competes with independent growers, handlers, processors and consumer packaged goods manufacturers for the sale of cranberries and cranberry products. Ocean Spray's members produce cranberry fruit that is processed into various products such as SDC, juice drinks, juice concentrate, and cranberry sauce. Ocean Spray packages these products under the "Ocean Spray" brand name and sells the products to retailers, bars and restaurants across the country.

63.     Ocean Spray also sells fresh and processed cranberries, particularly cranberry concentrate, to other consumer packaged goods manufacturers, like Welch's, Tropicana, Very Fine, Minute Maid, and Smuckers, that sell their own branded cranberry juice drinks in competition with Ocean Spray's branded products.

64.     Ocean Spray purchases fresh and processed cranberries from independent growers, handlers and processors, such as Cranberries Limited.

65.     There are high barriers to entry in the cranberry industry and limited entry into the cranberry market.  The cost of constructing and planting new cranberry bogs averages $35,000 to $50,000 per acre. Every acre of bog requires five acres of wetlands or some other water source. To develop the wetlands, growers often must obtain permits from the state government and undertake environmental impact assessments that could take two or more years to complete. Land suitable for cranberry bogs is limited, and cranberry bogs require specialized harvesting

equipment and bog management and skills.  A bog typically only begins bearing sufficient fruit 5-7 years after planting.

66.     Independent growers and B Pool members located in the United States, Canada, and Chile have been injured by Defendants' illegal schemes and conduct.

**Ocean Spray Has Market Power or a Dangerous Probability of Achieving Market Power**

67.     Ocean Spray dominates the cranberry market with 70% to 80% market share. Ocean Spray is the world's largest cranberry producer and controls more than three quarters of the world's cranberry supply.

68.     Randy Papadellis, CEO and President of Ocean Spray, has publicly stated that the future of the cranberry industry "is almost entirely dependent on the health and success of the Ocean Spray Cooperative." **Exhibit Ten** at page 4.  He has also said that independent growers "are simply looking in [at the Ocean Spray Cooperative] hoping that the Coop makes the right decisions because the [independent growers] will not have a voice or a vote. In fact, if Ocean Spray falters, it will take the entire industry down. So the future [of all cranberry growers] is tied to the Coop one way or another". ***Id.*** at pages 4-5.

69.     Ocean Spray Brands is North America's leading producer of shelf-stable juice drinks and, for the last four decades, has been the number-one bottled juice manufacturer. Ocean Spray is the only national cranberry brand.

**Ocean Spray Is Not Protected by the Capper-Volstead Act**

70.     Defendants' illegal acts are not exempt from the antitrust laws under the Capper-Volstead Act.  Ocean Spray's activities are the type of anticompetitive and predatory practices

that fall outside the legitimate objectives of an agricultural cooperative, and, thus, the Capper-Volstead Act does not immunize Ocean Spray from the antitrust laws.

71.    Furthermore, the Capper-Volstead Act does not protect Ocean Spray because Ocean Spray is not "operated for the mutual benefit of the members thereof". Rather, Ocean Spray is organized to increase the profitability of the Ocean Spray branded products to the detriment of the B Pool growers and to the benefit of the A Pool. Ocean Spray acts more like a handler, processer, and consumer packaged goods manufacturer than like an agricultural cooperative that seeks the best returns for the fruit of all its growers. Such behavior puts Ocean Spray outside the Capper-Volstead Act.

72.    Further, Defendants are not protected under the Capper-Volstead Act since they are separate economic actors pursuing separate economic interests that are contrary to the economic interests of an agricultural cooperative and the Cooperative's B Pool members.

73.    Historically, Ocean Spray was managed and operated by the cranberry growers through a board of directors who sought the highest price for the cranberry fruit of the Cooperative's members. All Ocean Spray growers earned returns on their crop based on the returns from the sales of Ocean Spray's branded products and the volume of fruit delivered to the Cooperative, less administrative and sales expenses.

74.    In early 2006, Ocean Spray created two classes of member-growers within the Cooperative: the A Pool and the B Pool. The A Pool was paid in the historical manner, based on the sales and profitability of the Ocean Spray branded products and the volume of fruit the grower delivered to the Cooperative. The B Pool growers, however, were paid on a different basis; they were paid based on the price of the processed cranberries sold to industrial buyers like

21

Kellogg's, General Mills and Pepsi which, in 2007, was higher than the payments made by Ocean Spray to its A Pool members. Chart 1.

75.    The economic interests of the A Pool differ from those of the B Pool, creating conflicts of interest between the two cranberry pools. The A Pool seeks the lowest price possible for the cranberry fruit in order to increase profit margins and returns obtained on branded products. The B Pool, like typical cooperative members, seeks the highest price possible for their fruit, which would result in the A Pool receiving lower profit margins on the Ocean Spray brand products. The A Pool members act outside the scope of their authority for their own benefit rather than for the benefit of all the Cooperative's members as a whole.

76.    The economic interests of the Board differ from those of the B Pool, creating conflicts of interest between the Board and the B Pool. The Board is controlled by the larger growers of the Cooperative who are members of the A Pool and who seek lower fruit prices and higher profit margins on the Ocean Spray branded products. The B Pool consists of former independent growers and returning former Ocean Spray growers. The Board prohibits the B Pool growers from joining the A Pool, except in very limited circumstances and upon approval of the Board. The Board implements policies that increase the volume sold and the profit margins of the branded products, and decrease the price obtained for the B Pool's fruit. The Board members act outside the scope of their authority for their own benefit rather than for the benefit of the cooperative as a whole. The members of the Board include, but are not limited to, the following:

Fran Podvin, Chairman;

Peter Dhillon, Vice Chairman;

22

Robert Rosbe, former Chairman and owner of A.D. Makepeace, Co., one of the defendants to the complaint filed in this Court as Case Number 55-418-3 and a signee to the Final Judgment; and

Jerome Jenko, a non-grower Board member and former Senior Vice President, General Counsel, and Secretary at Pillsbury/General Mills, a key customer of Ocean Spray and purchaser of commodity cranberries.

77.     The economic interests of the Managers also differ from those of the B Pool, creating adverse and conflicting economic interest between the Managers and the B Pool members. The Board hired the Managers, executives from the consumer packaged goods industry, to improve the sales and profitability of the Ocean Spray branded products. The Board tied the Managers' compensation to the volume sold and the profit margins of the branded products, rather than to the volume utilized and the price obtained for the cooperative members' fruit. The Managers act outside the scope of their authority for their own benefit rather than for the benefit of the cooperative as a whole. The Managers implement policies that increase the volume sold and the profit margins of the branded products, and decrease the price obtained for the B Pool's fruit.  The Managers include but are not limited to:

Randy Papadellis, CEO and President;

Richard Lees, CFO and Senior Vice President;

Mike Stamatakos, Vice President, Agricultural Supply Development;

Arun Hiranandani, former Director of Cooperative Development;

Tim Chan, former Vice President and CFO; and

Paul Stajduhar,Vice President, Corporate Strategy and Business Development.

78.     The economic interests of Ocean Spray Brands are different from those of the B Pool, creating conflicts between the B Pool on the one hand and Ocean Spray and Ocean Spray Brands on the other hand.  Ocean Spray, the Management and the Board created Ocean Spray

Brands, a wholly-owned subsidiary, in order to maximize the profitability of Ocean Spray's branded products. The members of the Board of Directors of Ocean Spray are the same members of the Board of Directors of Ocean Spray Brands. Ocean Spray Brands owns all the Ocean Spray branded products and the associated intellectual property rights. All business operations of Ocean Spray (the Cooperative), with the exception of contractual relations with member growers, are conducted under the name of Ocean Spray Brands. Ocean Spray Brands is responsible for manufacturing, marketing, and selling the branded products.

79.     The economic interests of Ocean Spray differ from those of the B Pool. Ocean Spray competes with the B Pool in the sale of cranberries. Beginning in 2008, Ocean Spray purchased land and began cranberry farming operations. The fruit harvested from these farms, upon information and belief, was treated in the same manner as the fruit received from the A Pool; it was used in Ocean Spray's branded products. Thus, Ocean Spray, like the A Pool, seeks higher profits for the branded products, which are obtained by artificially lowering the price of cranberries received by the B Pool. Ocean Spray acts outside the scope of its authority for its own benefit rather than for the benefit of all the members of the cooperative as a whole.

80.     The Defendants have not acted for the B Pool members' benefit. The Defendants have acted and continue to act against the interests of the B Pool, and they set and enact policies that artificially lower the price the B Pool receives for their fruit in order to increase the returns received by the A Pool from the sale of Ocean Spray's branded products.

**Overview of Ocean Spray's Unlawful "Auctions"**

81.     Defendants' illegal scheme for fixing the price of cranberry juice concentrate involves conducting sham online "auctions" at which Ocean Spray sells cranberry juice

concentrate.  *See* **Exhibit Fifteen**. The buyers at these sham "auctions" are food processors who use the concentrate in beverages that they sell in competition with Ocean Spray Brands. Ocean Spray Brands does not participate in the sham "auctions" since the cooperative's A Pool supplies the fruit for the Ocean Spray branded products. The prices paid by the buyers determine the prices Ocean Spray pays the independent growers and the B Pool for their cranberries. Ocean Spray held the sham "auctions" multiple times in 2009, 2010, 2011 and 2012, and it intends to continue holding the sham "auctions" in 2013 and into the future. The effect of these sham "auctions" is to unlawfully depress the prices received by independent growers and the B Pool below the prices that would have prevailed in an unrestrained market.

82.     Ocean Spray's "auctions" for cranberry juice concentrate are completely unlike typical auctions. The most obvious difference is that a typical auction allows bidders to compete with each other for scarce resources by naming their own price and allowing the highest price to win the bid. In contrast, Ocean Spray's "auctions" stifle competition by ensuring that cranberry juice concentrate will be sold at Ocean Spray's predetermined price and will be guaranteed to sell at that price for a specified period of time into the future.

83.     Before the "auction" takes place, Ocean Spray requires potential bidders to submit an application setting forth, among other things, the amount of concentrate each bidder desires. Ocean Spray then informs each bidder of the amount of concentrate each individual bidder is *allowed* to bid on during the "auction," which is often less concentrate than the bidder desires and would therefore bid on in a typical auction scenario. Ocean Spray further penalizes bidders if they bid on a larger volume of concentrate than it has apportioned for the bidder prior to the auction, even if the bidder needs the larger volume.  If the bidders comply with Ocean Spray's

volume restrictions, Ocean Spray sells additional concentrate to compliant bidders *after* the "auction" for the same or close to the same price Ocean Spray set at the "auction."

84.     Thus, unlike traditional auctions, whose outcome is uncertain because bidding occurs spontaneously according to the bidders' particular resources and needs, Ocean Spray's "auctions" are orchestrated ahead of time to ensure that Ocean Spray achieves a predetermined result: a price for cranberry juice concentrate that in turn ensures that Ocean Spray pays the class members a price for their cranberry fruit that runs below the cost of production. This ensures that Ocean Spray will receive the highest return on its Ocean Spray branded products while the Plaintiffs and the class members are forced either to accept unfairly low prices for their fruit or to exit the cranberry market altogether.

85.     Additionally, the sham "auction" ensures that the prices received by independent growers that do not sell to Ocean Spray also run below the cost of production. The sham "auction" sets the price for cranberry juice concentrate for the industry. And because the price of fresh, frozen and other processed cranberries is pegged to the price of cranberry juice concentrate, Ocean Spray predatorily fixes the prices for the entire cranberry market through its sham "auctions."

86.     At the first of its "auctions," Ocean Spray set the price or the opening bid at a level significantly lower than the price for cranberry juice concentrate that existed at that time in the unrestrained market. For each "auction," Ocean Spray determines at each stage of the "auction" what the "price" shall be for the next round. According to Ocean Spray's public documents, "[a]t no stage during the process do customers bid a price." **Exhibit Sixteen**.   In

addition to not bidding a price at the auction, the auction participants do not bid on the volume of concentrate they will receive.

87.     In subsequent "auctions," Ocean Spray set the price or opening bid at a level lower than the final bid from the previous "auction," and without regard to the supply and demand that existed in the market. For instance, in 2011 Defendant announced that the opening bid for the next auction would be 85% of the previous auction's closing prices. *See* **Exhibit Seventeen**.

88.     The predetermined nature of Ocean Spray's "auctions" manifests itself not only through Ocean Spray's determination of the auction price and bid amounts before the auction even begins, but also through a series of policies and practices Ocean Spray instituted to further decrease competition among purchasers and to discourage bidders from placing bids that differ from Ocean Spray's initial set price. Ocean Spray's policies constrain competition among its bidders in the following additional ways:

(a)     Ocean Spray limits the number of purchasers who are allowed to participate in the "auction," sometimes excluding purchasers who are credit-worthy or otherwise qualified and who submitted applications to participate in the "auction."

(b)     Ocean Spray limits the total volume of concentrate available for purchase during the "auction" even though Ocean Spray sells additional concentrate to the auction bidders *after* the "auction" at the price set by the "auction."

(c)     Before the "auction" takes place, Ocean Spray gives certain purchasers cranberry juice concentrate to "hold them over" and satisfy their requirements until the "auction" takes place. These purchasers do not have to pay for the concentrate until *after* the "auction." The price the purchasers pay is the price set by the "auction," even though the price for concentrate was higher at the time the purchasers received the concentrate than the actual price later established by the "auction." Thus, even though Ocean Spray could have received higher prices for the B Pool fruit sold at the "auction," it instead gave customers an interest-free loan at the B Pool's expense.

27

(d)     Ocean Spray limits the types of entities and individuals whom it allows to participate in the "auction" to those who require low volumes of concentrate. Ocean Spray discourages entities that require large volumes of concentrate, such as Kellogg's, General Mills or Pepsi, from directly participating in the auction, instead promising such large large-volume purchasers that they may purchase concentrate *after* the "auction" at the same price set at the "auction."

(e)     Ocean Spray limits the volume of concentrate any one bidder is allowed to obtain during any round of the "auction," even if the bidders desire more concentrate.

89.     As a result of Ocean Spray's "auctions" and the artificially low prices for cranberry concentrate that they set, many independent growers cannot sustain their businesses. Accordingly, some have ceased tending and harvesting their bogs altogether, others have gone into bankruptcy, and others have sold or are considering selling their bogs to A Pool growers.

90.     Still other independent growers were enticed into joining Ocean Spray's B Pool by Ocean Spray's promise that someday these growers would eventually become A Pool members. But while Ocean Spray admitted these independent growers as members of Ocean Spray's B Pool and accepted their crop for sale by Ocean Spray, Ocean Spray paid these growers much less money for their cranberries than it paid its other members.

**COUNT I**
**Violation of Capper-Volstead Act**
**Injuring B Pool Members**
**(Ocean Spray)**

91.     Plaintiffs incorporate and re-allege each allegation set forth in Paragraphs 1-90 above.

92.     The actions of Ocean Spray described herein discriminate against those members of Ocean Spray whose cranberries are considered to be in the B Pool. Ocean Spray is not operating the Association for the mutual benefit of the B Pool members who are being paid for

their cranberries less than one-half the amount Ocean Spray has been paying to its members whose cranberries are considered to be in its A pool. *See* **Chart 1**.

93.     The actions of Ocean Spray described herein violate the Capper-Volstead Act, 7 U.S.C. 291, which authorizes the formation of agricultural cooperatives such as Ocean Spray, "[p]ovided, however, that such associations are operated for the mutual benefit of the members thereof . . . ."

94.     Ocean Spray cannot be considered to have been engaged legally in the operation of an agricultural cooperative during the period of time in which it failed to administer the cooperative for the mutual benefit of its B Pool members.

95.     Ocean Spray's violation of the Capper-Volstead Act has injured Plaintiffs and the members of the B Pool Class.

WHEREFORE, Plaintiffs ask this court to declare that all actions of Ocean Spray during the period of time that it failed to administer the cooperative for the mutual benefit of its B Pool members are not protected by, and constitute violations of, the provisions of the Capper-Volstead Act, 7 U.S.C. § 291; to issue an injunction to prohibit such violations in the future; and to award damages in the amount of $120,000,000.00, together with interest, costs and attorney's fees and such other relief as the court shall deem just and proper in the circumstances.

**COUNT II**
**M.G.L. c. 93A, § 11**
**Violation of Capper-Volstead Act**
**B Pool Members**
**(Ocean Spray)**

96.     Plaintiffs incorporate and re-allege each allegation set forth in Paragraphs 1-95 above.

97.     Ocean Spray's violation of the Capper-Volstead Act has injured Plaintiffs and the members of the B Pool Class.

98.     Defendants' scheme to accept new growers into its cooperative and to dump their cranberries at prices so low that said growers do not receive, at most, even half of what other Ocean Spray growers receive, despite having signed contracts that are required by law to be "for the mutual benefit of the members . . . ." is inherently unfair and deceptive and a violation of M.G.L. c. 93A, § 11, and has injured Plaintiffs and the members of both classes they represent.

WHEREFORE, Plaintiff asks the court to find that such actions by Ocean Spray constitute unfair and deceptive practices in violation of M.G.L. c. 93A, § 11. Plaintiff class demands damages in the amount of $120,000,000.00 trebled in accordance with the provisions of M.G.L. c. 93A, § 2 and 11, together with an injunction to prohibit such actions in the future, plus interest, costs, attorneys' fees and such other relief as the court deems just and proper in the circumstances.

### COUNT III
**M.G.L. c. 93A, § 11**
**Violation of Final Judgment**
**Injuring B Pool Members**

99.     Plaintiffs incorporate and re-allege each allegation set forth in Paragraphs 1-98 above.

100.    Ocean Spray has discriminated against all members of the B Pool Class by paying the B Pool substantially less for their cranberries than it paid to members whose cranberries were considered to be in the A Pool.  *See* **Chart 1**.

30

101.    These payments by Ocean Spray violated the Final Judgment, which provides that Ocean Spray would not "[d]iscriminat[e] among its members in the administration of any pooling of cranberries." **Exhibit Three** at § IV(F)(2).

102.    As persons for whom the Final Judgment grants relief, members of the B Pool, including plaintiffs and the B Pool class they represent, have standing to sue to enforce the Final Judgment under Fed. R. Civ. P. 71.

103.    Before and at the time Defendant began its scheme to fix the price of cranberry juice concentrate, and at all times thereafter, Ocean Spray was seeking to obtain additional cranberries because it said that it did not have enough cranberries to meet its needs, investing $90 Million in new cranberry bogs. **Exhibit Eighteen** (January 14, 2009, "We desperately need more fruit"). *See also*, **Exhibit Nineteen** ("Chairman Podvin - The new cranberry acreage is needed by the cooperative to supply growth of our business"); **_Id._** at page 2 ("Retention of growers . . . and expanding acreage are the principal challenges facing us today.")

104.    The B Pool growers entered into their contracts with Ocean Spray in good faith. They have honored their responsibilities under the contract, but, nowhere in the contract is there any language which permits Ocean Spray to sell the crop of the B Pool growers at prices that are not in the mutual interest of all growers. Ocean Spray has failed in its obligation under its contracts to fulfill its obligation of good faith and fair dealing. Ocean Spray's conduct is inherently unfair and deceptive in violation of M.G.L. c. 93A, § 11.

105.    Ocean Spray's violation of the Final Judgment has injured Plaintiffs and the members of the B Pool Class.

WHEREFORE, plaintiffs demand damages in the amount of $120,000,000.00 trebled in accordance with the provisions of M.G.L. c. 93A, § 11, together with interest, costs, attorney's fees, and an injunction to prohibit said violations by Ocean Spray in the future, plus such other relief as the court shall deem just and proper in the circumstances.

**COUNT IV**
**M.G.L. c. 93A, § 11**
**Injuring Independent Growers**

106.     Plaintiffs incorporate and re-allege each allegation set forth in Paragraphs 1-105 above.

107.     The remaining members of the class are all independent growers who have been the victims of Ocean Spray's illegal price fixing of cranberry juice concentrate.

108.     All of said members have lost a great amount of money as a result of said price fixing by Ocean Spray, as shown in **Charts 1 and 2**.

109.     The actions cited herein by Defendants constitute unfair and deceptive acts and practices including price-fixing, attempting to monopolize and monopsonize, monopolization and monopsonization of trade in commerce in violation of M.G.L. c. 93A, § 11.

WHEREFORE, plaintiffs demand damages in the amount of $500,000,000.00 trebled in accordance with the provisions of M.G.L. c. 93A, § 11, together with interest, costs, attorney's fees, and an injunction to prohibit said violations by Ocean Spray in the future, plus such other relief as the court shall deem just and proper in the circumstances.

**COUNT V**
**M.G.L. c. 93A, § 11**
**Violation of Final Judgment**
**Injuring Independent Growers and B Pool Members**

110.    Plaintiffs incorporate and re-allege each allegation set forth in Paragraphs 1-109 above.

111.    Ocean Spray's predecessor agreed in the Final Judgment that it would be enjoined and would be restrained from

> (D) Contracting for or otherwise arranging for the processing of any of [its] cranberries by any other processor at any time when [it] has available capacity and could process such cranberries itself without incurring substantially greater expense . . . .

112.    Ocean Spray's sale of cranberries to processors that convert the cranberries into juice concentrate and finally into cranberry beverages is effectively the same as converting cranberries into cranberry juice concentrate and then selling it to other processors for the production of cranberry beverages.  Such conduct violates the Final Judgment.

113.    Ocean Spray's violation of the Final Judgment has injured the independent and B Pool classes by creating a second class of members within the cooperative whose fruit is used to predatorily fix the prices of cranberries in the market below the cost of production. Ocean Spray admits that it "does not sell concentrate through the auction to unload excess supply . . . .: (**Exhibit Twenty** at page 2) and ". . . we have had . . . ten consecutive years of increasing cranberry fruit demand. . . ." (**Exhibit Twenty-One**).

114.    Defendants' actions described herein violate Section (D) of the Final Judgment, and have injured Plaintiffs and the members of both classes they represent.

WHEREFORE, Plaintiffs seek an Order requiring Ocean Spray to cease and desist from all such sales together with damages in the amount of $620,000,000.00 trebled in accordance with the provisions of M.G.L. c. 93A, § 11, and 15 U.S.C. § 15, together with interest, costs,

attorney's fees and an injunction to prevent Ocean Spray from engaging in said sales in the future plus such other relief as the court shall deem just and proper in the circumstances.

**COUNT VI**
**Injuring Independent Growers and B Pool Members**

115.     Plaintiffs incorporate and re-allege each allegation set forth in Paragraphs 1-114 above.

116.     Defendants' actions described above in violation of the Capper-Volstead Act, 7 U.S.C. 291; Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and Massachusetts General Laws, c. 93A, §§ 2 and 11, all show a deliberate disregard for the law and for Defendants' responsibilities under it. Defendants have engaged in clearly unfair and deceptive acts and practices which caused damages to all classes in the amount of $620,000,000.00.

WHEREFORE, this court should award damages to all classes in the amount of $620,000,000.00, trebled with interest, costs, and attorneys' fees, and an injunction to prevent all of the illegal acts from being engaged in in the future, and such other relief as the court shall deem just and proper in the circumstances.

**COUNT VII**
**All Statutes**
**Injuring Independent Growers and B Pool Members**

117.     Plaintiffs incorporate and re-allege each allegation set forth in Paragraphs 1-116 above.

118.     Defendants' actions described above in violation of the Capper-Volstead Act, 7 U.S.C. 291; the Final Judgment; Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and Massachusetts General Laws, c. 93A, §§ 2 and 11, all show a deliberate disregard for the law and

for Defendants' responsibilities under it.   Defendants have engaged in clearly unfair and deceptive acts and practices which caused damages to all classes in the amount of $620,000,000.00.

WHEREFORE, this court should award damages to all classes in the amount of $620,000,000.00, trebled with interest, costs, and attorneys' fees, and an injunction to prevent all of the illegal acts from being engaged in in the future, and such other relief as the court shall deem just and proper in the circumstances.

**COUNT VIII**
**Violation of the Sherman Act, 15 U.S.C. § 2**
**Monopolization and Attempted Monopolization**
**Injuring Independent Growers and B Pool Members**

119.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs.

120.   Ocean Spray willfully and purposefully engaged in a pattern of anti-competitive conduct, as described above, in an attempt to monopolize the relevant cranberry market by fixing the prices of fresh and processed cranberries to harm the Plaintiffs.

121.   Given Ocean Spray's substantial market power, there is a dangerous probability of Ocean Spray achieving a monopoly.

122.   Ocean Spray's actions, as described above, manifest a specific intent to monopolize the relevant cranberry market.

123.   Ocean Spray's violations of the Sherman Act, 15 U.S.C. § 2, have injured Plaintiffs and members of both classes they represent in their business and property.

WHEREFORE, Plaintiffs seek damages in the amount of $620,000,000.00 trebled in accordance with the provisions of 15 U.S.C. § 15, together with interest, costs, attorney's fees, and an injunction to prevent Ocean Spray from engaging in said unlawful actions in the future plus such other relief as the court shall deem just and proper in the circumstances.

**<u>COUNT IX</u>**
**Violation of the Sherman Act, 15 U.S.C. § 2**
**Monopsonization and Attempted Monopsonization**
**Injuring Independent Growers and B Pool Members**

124.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs.

125.    Ocean Spray willfully and purposefully engaged in a pattern of anti-competitive conduct, as described above, in an attempt to monopsonize the relevant cranberry market by fixing the prices of fresh and processed cranberries to harm the Plaintiffs.

126.    Given Ocean Spray's substantial market power, there is a dangerous probability of Ocean Spray achieving a monopsony.

127.    Ocean Spray's actions, as described above, manifest a specific intent to monopsonize the relevant cranberry market.

128.    Ocean Spray's violations of Section 2 the Sherman Act, 15 U.S.C. § 2, have injured Plaintiffs and the members of both classes they represent in their business and property.

WHEREFORE, Plaintiffs seek damages in the amount of $620,000,000.00 trebled in accordance with the provisions of 15 U.S.C. § 15, together with interest, costs, attorney's fees, and an injunction to prevent Ocean Spray from engaging in said unlawful actions in the future plus such other relief as the court shall deem just and proper in the circumstances.

## COUNT X
### Violation of the Sherman Act, 15 U.S.C. § 2
### Conspiracy to Monopolize and Monopsonize
### Injuring Independent Growers and B Pool Members

129.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs.

130.    At all times relevant to this Complaint, the Defendants willfully, knowingly and intentionally conspired with the specific intent to monopolize and monopsonize the cranberry market, and thereby to depress, fix and stabilize the price of fresh and processed cranberries to harm the Plaintiffs. This conspiracy caused and continues to cause substantial anticompetitive effects and achieves no legitimate efficiency benefit.

131.    The Defendants willfully and purposefully engaged in a pattern of anti-competitive conduct, as described above, designed to monopolize and monopsonize the cranberry market to depress, fix and stabilize the price of fresh and processed cranberries, to harm the Plaintiffs, and to improperly allow Ocean Spray to attain monopoly and monopsony power in the relevant cranberry market.

132.    Given Ocean Spray's substantial market power, there is a dangerous probability of Ocean Spray achieving a monopoly and monopsony.

133.    As a result of these agreements, Plaintiffs and class members have been forced to accept depressed prices for fresh and processed cranberries. But for the conspiracy alleged herein, the prices obtained by Plaintiffs and the class members would have been significantly higher.

134.    Defendants' actions, as described above, manifest a specific intent to monopolize and monopsonize the cranberry market.

135.    Defendants' violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, have injured Plaintiffs and the members of both classes they represent in their business and property.

WHEREFORE, Plaintiffs seek damages in the amount of $620,000,000.00 trebled in accordance with the provisions of 15 U.S.C. § 15, together with interest, costs, attorney's fees, and an injunction to prevent Defendants from engaging in said unlawful actions in the future plus such other relief as the court shall deem just and proper in the circumstances.

**COUNT XI**
**Violation of the Sherman Act, 15 U.S.C. § 1**
**Conspiracy to Fix Prices**
**Injuring Independent Growers and B Pool Members**

136.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs.

137.    At all times relevant to this Complaint, the Defendants have engaged in a continuing contract, combination or conspiracy with respect to the sale of fresh and processed cranberries in unreasonable restraint of trade and commerce.

138.    The contract, combination or conspiracy consisted of an agreement among the Defendants to fix, reduce, stabilize, or maintain artificially depressed prices for fresh and processed cranberries paid to the Plaintiffs.

139.    In formulating and effectuating the conspiracy, the Defendants met and agreed to fix, reduce, stabilize or maintain at artificially depressed levels the prices the Plaintiffs received for their for fresh and processed cranberries.

140.    As a result of these agreements, Plaintiffs and class members have been forced to accept depressed prices for fresh and processed cranberries.  But for the conspiracy alleged

herein, the prices obtained by Plaintiffs and the class members would have been significantly higher.

141.    Defendants' actions, as described above, manifest a specific intent to predatorily fix prices in the cranberry market.

142.    Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, has injured Plaintiffs and the members of both classes they represent in their business and property.

WHEREFORE, Plaintiffs seek damages in the amount of $620,000,000.00 trebled in accordance with the provisions of 15 U.S.C. § 15, together with interest, costs, attorney's fees, and an injunction to prevent Defendants from engaging in said unlawful actions in the future plus such other relief as the court shall deem just and proper in the circumstances.

## COUNT XII
### All Statutes
### Injuring Independent Growers and B Pool Members

143.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs.

144.    Defendants' actions described above in violation of the Capper-Volstead Act, 7 U.S.C. 291; the Final Judgment; Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and Massachusetts General Laws, c. 93A, §§ 2 and 11, all show a deliberate disregard for the law and for Defendants' responsibilities under it. Defendants have engaged in clearly unfair and deceptive acts and practices which caused damages to all classes in the amount of $620,000,000.00.

WHEREFORE, this court should award damages to all classes in the amount of $620,000,000.00, trebled in accordance with the provisions of 15 U.S.C. § 15 together with

interest, costs, attorneys' fees, and an injunction to prevent all of the illegal acts from being engaged in in the future, and such other relief as the court shall deem just and proper in the circumstances.

**COUNT XIII**
**M.G.L. c. 93A Sec. 11**
**Retaliation against Plaintiffs Barry K. Winters d/b/a BKW Farm, and**
**Paul D. Sogn d/b/a Wintersogn Farm**

145.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs.

146.    Plaintiffs Barry K. Winters, d/b/a BKW Farms, and Paul D. Sogn, d/b/a Wintersogn Farm, LLC, bring a separate and distinct cause of action for retaliatory conduct of Defendant Ocean Spray on behalf of themselves for injunctive and declaratory relief under the antitrust laws of the United States and the Federal Rules of Civil Procedure.

147.    Plaintiff Barry K. Winters, d/b/a BKW Farms, entered into a three year Cranberry Marketing Agreement with Defendant Ocean Spray on March 25, 2010 (the "Winters CMA"). The Winters CMA expires on August 31, 2013.

148.    Plaintiff Paul D. Sogn, d/b/a Wintersogn Farm, entered into a three year Cranberry Marketing Agreement with Defendant Ocean Spray on April 30, 2010 which expires August 31, 2013 (the "Sogn CMA").

149.    On December 20, 2012, after the filing of Plaintiffs' Complaint herein, Defendant Ocean Spray and Michael Stamatakos, Vice President of Agriculture Supply and Development for Defendant Ocean Spray, sent certified letters to Plaintiffs Barry K. Winters, d/b/a BKW Farms, and Paul D. Sogn d/b/a Wintersogn Farm.  The letters gave notice

that Defendant Ocean Spray was terminating the Winters CMA and the Sogn CMA effective January 1, 2013 (the "Termination Letters").   *See* **Exhibits Twenty-Two and Twenty-Three**.

150.    The Termination Letters expressly state: "This Notice of Termination is based on the fact that you [Barry Winters, d/b/a BKW Farms, and Paul D. Sogn, d/b/a WinterSogn Farm] are named plaintiffs in a lawsuit recently filed in the United States District Court for the District of Massachusetts (C.A. No. 1:12-12016-RWZ). Because you have elected to participate in this action against Ocean Spray, we are no longer interested in doing business with you or with (your) farms." *See **id**.*

151.    Defendant Ocean Spray, through the Termination Letters, undertakes   to intimidate and coerce Plaintiffs participating in the pending litigation against Defendant Ocean Spray.

152.    The purpose of terminating the  Winters  CMA  and  the  Sogn  CMA  is for the purpose of frustrating this pending litigation, intimidating other B Pool members from electing to participate in the class action lawsuit, reducing the income of the Plaintiffs that elect to participate in the antitrust class action lawsuit, and rendering  it more difficult for these Plaintiffs to finance the class action antitrust suit.

153.    Defendant Ocean Spray's actions constitute a contemptuous attack upon the integrity of the judicial system and Plaintiffs would be damaged irreparably if they were denied continued access to this Court to seek redress for Defendants' violations of the 1957 Final Judgment, the Capper-Volstead Act, 7 U.S.C. § 291, the Sherman Act, 15 U.S.C. §§ 1 and 2, and M.G.L. c. 93 a, § 11.

154.    Defendant Ocean Spray's termination of the Winters CMA and the Sogn CMA constitutes obstruction of judicial proceedings.

155.    Defendant Ocean Spray's wrongful termination against Plaintiffs and others similarly situated have irreparably damaged Plaintiffs and others similarly situated.

156.    Plaintiffs and others similarly situated have no adequate remedy at law.

157.    Plaintiffs have a reasonable likelihood of success on the merits of this litigation.

158.    Alternatively, even before Plaintiffs show a reasonable likelihood of success on the merits, the Court has inherent equity power to prevent obstruction of judicial proceedings and to jealously guard the rights of litigants to prosecute an antitrust suit free from intimidation and threats.

159.    Plaintiffs seek a mandatory preliminary injunction to issue reinstating the Cranberry Marketing Agreements between Plaintiffs and Defendant Ocean Spray.

160.    Plaintiffs seek a mandatory preliminary injunction enjoining Defendant Ocean Spray from terminating or failing to renew any B Pool members' Cranberry Marketing Agreement without first obtaining an Order of this Court.

161.    Plaintiffs seek a protective order restraining Defendant Ocean Spray from talking to any B Pool member of the Cooperative about this pending litigation.

162.    Plaintiffs, upon a showing of reasonable likelihood of success on the merits of the litigation herein as pertains to the B Pool members, seek a permanent injunction enjoining Defendant Ocean Spray from taking any action adverse to any B Pool member, or any action to coerce any B Pool member to settle this lawsuit, or attempt to in any manner discourage or intimidate any B Pool member from participating as a Plaintiff or witness in this litigation.

WHEREFORE, this court should issue a permanent injunction (1) reinstating the B Pool Cranberry Marketing Agreements terminated by Defendant Ocean Spray, (2) enjoining Defendant Ocean Spray from terminating or failing to renew any B Pool member's Cranberry Marketing Agreement without first obtaining an Order from this Court, (3) restraining Defendants from taking any action adverse to any B Pool member, (4) restraining Defendants from taking any action to coerce any B Pool member to settle this lawsuit, (5) restraining Defendants from taking any action that discourages or intimidates any B Pool member or independent grower from participating as a Plaintiff in this lawsuit, and (6) restraining Defendants from taking any action that discourages or intimidates any witness or potential witness. This Court should award attorneys' fees and costs, and such other relief as the court shall deem just and proper in the circumstances.

Respectfully submitted,

/s/ Arthur R. Miller
Arthur R. Miller, Esq.
University Professor, NYU School of Law
40 Washington Square South, Room 430F
New York, NY 10012
212-992-8147

/s/ Norman Jackman
Norman Jackman, Esq.
JACKMAN & ROTH LLP
1600 Massachusetts Avenue, Suite 502
Cambridge, Massachusetts 02138
617-682-8049

/s/Manuel C. Hernandez,
Manuel C. Hernandez, Esq., *Pro Hac Vice*
Hernandez and Associates, LLC
P.O. Box 979
Bandon, Oregon 97411
(541) 347-2911

/s/Frederick J. Carleton
Frederick J.Carleton, Esq., *Pro Hac Vice*
Carleton Law Offices
P.O. Box 38
Bandon, Oregon 97411
(541) 347-2468

/s/ Shala McKenzie Kudlac
Shala McKenzie Kudlac, Esq., *Pro Hac Vice*
Carleton Law Offices
P.O. Box 38
Bandon, Oregon 97411
(541) 347-2468