UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 12-12016-RWZ


GROWERS 1-7, *et al.*

v.

OCEAN SPRAY CRANBERRIES, INC., *et al.*


MEMORANDUM OF DECISION

May 2, 2014


ZOBEL, J.

In this antitrust case, plaintiffs, on behalf of themselves and all others similarly situated, allege defendants Ocean Spray Cranberries, Inc. ("OS"), and Ocean Spray Brands, L.L.C. ("OSB"), unlawfully fixed the price of cranberry juice concentrate to (1) increase the revenues of the OS agricultural cooperative's favored "A Pool" members to the detriment of its disfavored "B Pool" members; (2) prevent OS's members from leaving the cooperative to find a better price for the cranberries they grow; and (3) force independent growers to join the cooperative or exit the market.

Specifically, they claim "B Pool" members receive less money for their crop than do "A Pool" members. OS sells "B Pool" fruit as cranberry juice concentrate in an online "auction." But the auction is phony because OS pre-determines the price at which it sells the concentrate, and it sets that price below market value. This action violates (1) a 1957 final court judgment memorializing an agreement in which OS

pledged not to discriminate among its members; (2) the Capper-Volstead Act, 7 U.S.C.
§§ 291-92; (3) Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and (4)
Massachusetts General Laws Chapter 93A.

Defendants move to dismiss all counts (Docket # 47).  The motion is ALLOWED
IN PART and DENIED IN PART.

## I.     Background[1]

Plaintiffs are a group of independent cranberry growers and a group of "B Pool"
cranberry growers.  OS, an agricultural cooperative, has more than seven hundred
grower-members in Canada, Chile, and the United States.  OSB is a wholly-owned
subsidiary of OS.  OS's grower-members produce the fruit that is used to make OS's
brand-name products.  OS also sells cranberry juice concentrate to competitors, who
make it into juice and sell it under their name in competition with OS.  Independent
growers sell their fruit to OS and its competitors.

In the past, cranberry growers managed OS and sought the highest price for
their fruit.  Grower-members earned money based on the volume of fruit they delivered
to OS and on the returns from sales of OS-branded products.  But in 2006, OS split its
cooperative into two groups: the "A Pool" and the "B Pool."  "A Pool" members continue
with the old model; they are paid based on the sales and profitability of OS-branded
products.  "B Pool" members are paid based on the price of cranberries sold to
industrial buyers; in other words, "B Pool" members get the "commodity price" of
cranberries.  Thus, the two groups are at economic cross-purposes.  "A Pool" growers

---

[1]The following facts are taken from the Third Amended Class Action Complaint (Docket # 44).

want the price of cranberries to be low.  Assuming steady pricing of OS's brand name products, lower cranberry prices mean a higher profit margin, and with higher profits comes higher compensation to "A Pool" members.  "B Pool" members want the price of cranberries to be high.  If the commodity price is higher, they get more money because their compensation and the commodity price are one and the same.  There is no difference in the quality of the cranberries "A Pool" and "B Pool" members produce.

In 2007 and 2008, OS executives became worried about the high prices OS competitors were paying independent growers for their fruit.  Some OS growers "defected" and sold to competitors, jeopardizing OS's cranberry supply.  OS's management and Board of Directors—comprised of "A Pool" members—allegedly responded to this concern by engaging in predatory pricing to eliminate grower competition.

They did so by holding sham auctions, beginning in 2009 and continuing to the present day.  The price buyers pay at these auctions determines how much OS pays the "B Pool" members and independent growers for their cranberries.  Unlike a typical auction, at which bidders compete and the highest price wins, OS pre-sets the sale price and informs each bidder of the amount of concentrate on which it is allowed to bid.  What is more, OS sets the price below the cost of production for the growers.  As a result of these low prices, consumer goods manufacturers terminated their contracts with independent growers and turned to OS to supply their cranberries.  Independent growers have been forced either to accept the low price OS pays them or exit the market altogether.  And by fixing a low commodity price, OS ensures a higher profit

margin for its "A Pool" members at the expense of its "B Pool" members.

Aggrieved by this practice, plaintiffs filed a thirteen count complaint which defendants now move to dismiss in its entirety.

## II.  Legal Standard

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  I accept as true all factual allegations contained in the complaint, but not legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  If the complaint fails to state a plausible claim upon which relief can be granted, it must be dismissed.  Id.

## III.  Analysis[2]

### A.  Count I: Capper-Volstead Act ("B Pool" Members)

The Capper-Volstead Act ("CVA"), 7 U.S.C. § 291, allows producers of agricultural products to form cooperative associations "operated for the mutual benefit of the members thereof," and if those cooperatives comply with certain statutory conditions, they can collectively process and market their products without incurring liability under the antitrust laws.[3]  Plaintiffs interpret "mutual benefit" to require cooperative members to "share in the profits on substantially the same footing."  Pls.' Mem. in Opp. to Mot. to Dismiss, Docket # 53, at 2.  Because OS's pricing structure places "A Pool" members on a better footing than "B Pool" members, plaintiffs allege

---

[2]Plaintiffs bring some claims on behalf of "B Pool" members, some on behalf of independent growers, and some on behalf of both groups.  I note in the count heading on whose behalf plaintiffs bring each claim.

[3]The CVA does not exempt agricultural cooperatives from liability under the Sherman Act.  Md. & Va. Milk Producers Ass'n v. United States, 362 U.S. 458, 463 (1960).

4

OS violates the CVA.  Third Amended Class Action Complaint ("TAC"), Docket # 44 ¶ 92.

Defendants counter that the CVA creates an affirmative defense, not a cause of action.  Defs.' Mem. in Supp. of Mot. to Dismiss, Docket # 48, at 4 (citing Alexander v. Nat'l Farmers Org., 687 F.2d 1173, 1178 (8th Cir. 1982); Allen v. Dairy Farmers of Am., Inc., 748 F. Supp. 2d 323, 345 (D. Vt. 2010)).  The CVA's text is permissive.  If a cooperative complies with the statutory conditions, then its members enjoy the limited antitrust immunity; if they do not comply, then they are not immune.  Neither scenario involves a "violation."  Plaintiffs cannot sue defendants for failing to do something the law does not obligate them to do.

This disagreement raises a statutory interpretation question, so I begin with the language of CVA itself.  United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989).  It provides, "[p]ersons engaged in the production of agricultural products . . . may act together in associations, . . . may have marketing agencies in common[,] . . . [and] may make the necessary contracts and agreements to effect such purposes."  7 U.S.C. § 291 (emphasis added).  This language creates an optional benefit, not an obligation capable of being violated.  Nor does the purpose of the statute suggest otherwise.  As courts have consistently recognized, Congress passed the CVA to extend the limited antitrust exemption to agricultural cooperatives which have capital stock.  Case-Swayne Co. v. Sunkist Growers, Inc., 389 U.S. 384, 391 (1967); Northland Cranberries, Inc. v. Ocean Spray Cranberries, Inc., 382 F. Supp. 2d 221, 225 (D. Mass. 2004).  Plaintiffs do not cite a single case in which a court construes the CVA to

provide a cause of action.[4]   See In re Processed Egg Prods. Antitrust Litig., 836 F.

Supp. 2d 290, 301 (E.D. Pa. 2011) ("[A]ny federal cause of action in antitrust cases

involving agricultural producers arises under the Sherman Act, not the

Capper–Volstead Act or similar federal law.").

The text and purpose of the CVA make clear it does not create a cause of

action.[5]   Count I fails.

**B.      Count II: Chapter 93A Based on Violation of CVA ("B Pool" Members)**

Plaintiffs claim OS's practice of selling concentrate at prices substantially below

what "A Pool" members receive for their fruit contravenes the CVA and is therefore

unfair and deceptive, in violation of Massachusetts General Laws Chapter 93A.[6]   TAC

¶¶ 97-98.   Defendants respond that there is no basis for the claim that a CVA violation

automatically establishes a 93A violation.   Plaintiffs, they say, do not explain how the

supposed violation of the CVA is "unfair and deceptive."   Mem. in Supp. at 6.

To prove a chapter 93A violation, the statute allegedly violated need not contain

a private cause of action, so long as the violation of the underlying statute is unfair or

deceptive.   Orozco v. GMAC Mortg., L.L.C., Civil Action No. 11-11135-FDS, 2012 WL

4581092, at *3 (D. Mass. Oct. 1, 2012).   And "it is neither necessary nor sufficient that

---

[4]The one case plaintiffs cite, Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc., 338 F. Supp. 1019 (S.D. Tex. 1972), sidestepped the question by requiring plaintiffs to first show that defendants violated the CVA before it determined whether the statute offered a private cause of action. Id. at 1024.

[5]For this reason, I need not consider whether plaintiffs' interpretation of "mutual benefit" requires substantially similar benefit for all cooperative members.

[6]Section 11 of Chapter 93A allows a person who engages in the conduct of trade or commerce to bring suit alleging that the unfair method of competition or unfair or deceptive act of another person engaged in trade or commerce caused him loss of money or property.

a particular act or practice violate common or statutory law."  Mass. Eye & Ear Infirmary

v. QLT Phototherapeutics, Inc., 552 F.3d 47, 66 (1st Cir. 2009).  But plaintiffs hinge

their 93A violation on a CVA violation; defendants violated 93A because they violated

the CVA.  TAC ¶ 98.  As noted above, however, the CVA cannot be violated.

Accordingly, plaintiffs fail to state a chapter 93A claim.

## C.    Count III: Chapter 93A Based on Violation of 1957 Final Judgment ("B Pool" Members)

The 1957 Final Judgment memorializes an agreement between National

Cranberry Association ("NCA"), OS's predecessor corporation, and the United States,

in a suit alleging NCA monopolized interstate trade and commerce in cranberry

products in violation of Sections 1 and 2 of the Sherman Antitrust Act.  In the Final

Judgment, NCA was enjoined from "receiving from any person not a member of [its

cooperative] for marketing any cranberries except on the same terms or conditions as

to payment therefor as would apply if such person were a member."  Docket # 57-25 §

IV(F)(1).  It was also enjoined from "[d]iscriminating among members in the

administration of any pooling of cranberries."  Id. § IV(F)(2).  Plaintiffs allege OS

discriminates against "B Pool" growers by paying them less than it pays "A Pool"

growers.  This unequal treatment is unfair and deceptive.

Defendants contend plaintiffs were not parties to the Final Judgment and

therefore lack standing to enforce it.  Mem. in Supp. at 7-8; see Blake v. Prof'l Coin

Grading Serv., 898 F. Supp. 2d 365, 383 n.12 (D. Mass. 2012).  Plaintiffs counter that

the language of the Judgment shows the parties intended to give OS's members the

right to enforce it.  Mem. in Opp. at 19 (citing Final Judgment §§ III, X).  And they say Federal Rule of Civil Procedure 71[7] provides a right to enforce it.

Defendants are correct.  "A well-settled line of authority from [the Supreme] Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it."  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 750 (1975).  Plaintiffs' argument about the intent of the drafting parties is of no moment.  Furthermore, Rule 71 simply sets forth a procedure for a party to sue when it already has standing.  It does not confer standing where it does not otherwise exist.  James Wm. Moore et al., Moore's Federal Practice § 71.03 & n.5 (3d ed. 2013).  For these reasons, plaintiffs lack standing to enforce the Final Judgment.

### D.   Count IV: Chapter 93A Based on Anticompetitive Conduct (Independent Growers)

Here, plaintiffs assert that defendants' attempted and actual monopolization and monopsonization is an unfair or deceptive business practice.  TAC at ¶ 109.  Defendants respond that merely repeating the allegations contained in a plaintiff's underlying statutory claim is not enough to show a chapter 93A violation when the underlying claim is not cognizable.  Mem. in Supp. at 19 (citing Davis, Malm, D'Agostine, P.C. v. Vale, No. 041495, 2005 WL 1155171, at *4 (Mass. Super. Ct. Mar. 31, 2005)).  Defendants hinge their opposition to this 93A claim on their opposition to the monopolization and monopsonization claims.

---

[7]The Rule states, "[w]hen an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party."

Anticompetitive conduct is cognizable under 93A. F. Ciardi v. Hoffmann-LaRoche Ltd., 762 N.E.2d 303, 307-08 (Mass. 2002).  A plaintiff may bring a 93A claim even if it is unable to bring a statutory antitrust claim.  Id. at 312; see Slaney v. Westwood Auto, Inc., 322 N.E.2d 768, 772 (Mass. 1975) (characterizing 93A as "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights").  And as explained infra, plaintiffs have, in fact, stated a claim for actual and attempted monopolization and monopsonization.  For these reasons, plaintiffs' 93A claim based on defendants' alleged anticompetitive conduct survives as well.

### E.     Count V: Chapter 93A Based on Violation of Final Judgment ("B Pool" Members and Independent Growers)

Plaintiffs claim defendants' violation of the Final Judgment is an unfair or deceptive business practice in violation of chapter 93A.  This claim fails for the same reason as Count III: plaintiffs lack standing to enforce the Final Judgment.

### F.     Count VI: "All Statutes" ("B Pool" Members and Independent Growers)

I need not analyze this count because plaintiffs concede it should be dismissed. Mem. in Opp. at 19 n.20.

### G.     Count VII: "All Statutes" ("B Pool" Members and Independent Growers)

In Count VII, plaintiffs allege that the conduct "described above" violates the CVA, the Final Judgment, the Sherman Act, and chapter 93A.  Defendants rightly respond that this "catch-all" claim duplicates plaintiffs' other claims and should be

dismissed as redundant.  Apparently recognizing its redundancy, plaintiffs request

leave to amend.  It is denied.  Plaintiffs have already amended the complaint three

times (Docket ## 28, 29, 44).   Their request to amend—consisting of a single sentence

without any specific plan to resolve ambiguity—is not enough to get them "a fourth

chance to try to get it right."  See United States ex rel. Gagne v. City of Worcester, 565

F.3d 40, 48 (1st Cir. 2009) (stating the district court has "significant latitude" in deciding

whether to grant leave to amend, and the repeated failure to cure deficiencies is a valid

reason to deny leave (quotation and citation omitted)).

### H.   Count VIII: Monopolization and Attempted Monopolization in Violation of the Sherman Act, 15 U.S.C. § 2 ("B Pool" Members and Independent Growers)

#### 1.   Actual Monopolization

"The offense of monopoly under s 2 of the Sherman Act has two elements: (1)

the possession of monopoly power in the relevant market[8] and (2) the willful

acquisition or maintenance of that power as distinguished from growth or development

as a consequence of a superior product, business acumen, or historic accident."

United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).  Usually, the wrongful

act—the acquisition or maintenance of monopoly power— is "designed to exclude

---

[8]Defendants do not appear to challenge the first element.  I note, however, that plaintiffs have alleged sufficient facts to satisfy it.  The complaint states that OS has a 70-80% share of the world's cranberry market.  TAC ¶ 67.  The barriers to entry in the market are high as well.  The cost of constructing and planting a new cranberry bog averages $35,000 to $50,000 per acre.  Id. at ¶ 65; see Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 197 (1st Cir. 1996) (stating market power may be proved circumstantially by showing, inter alia, that the defendant has a dominant market share and that there are significant barriers to entry); Hewlett-Packard Co. v. Bos. Scientific Corp., 77 F. Supp. 2d 189, 195-96 (D. Mass. 1999) ("For pleading purposes, an allegation of market share of 70 percent has been held to be an adequate basis for an inference of power in a relevant market.").

competitors from the market." <u>Fraser v. Major League Soccer, L.L.C.</u>, 284 F.3d 47, 61

(1st Cir. 2002).  Here, the alleged wrongful act is predatory pricing, which

> occurs when a firm sets its prices temporarily below its costs, with the
> hope that the low price will drive a competitor out of business, after which
> the "predatory" firm will raise its prices so high that it will recoup its
> temporary losses and earn additional profit, all before new firms, attracted
> by the high prices, enter its market and force prices down.

<u>Clamp-All Corp. v. Cast Iron Soil Pipe Inst.</u>, 851 F.2d 478, 483 (1st Cir. 1988).  Thus, to

state a predatory pricing claim, plaintiffs must show (1) the price of defendants'

products is "below an appropriate measure of [defendants'] costs"; and (2) there is a

"dangerous probability" that defendants will recoup their investment in below-cost

prices.  <u>Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp.</u>, 509 U.S. 209, 222

(1993).  These requirements are demanding because recoupment is often implausible

and because a predatory pricing claim can be confused with the mere offering of low

prices to customers.  <u>Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.</u>, 998 F.2d 1073, 1080

(1st Cir. 1993).

According to defendants, plaintiffs cannot meet these requirements for two

reasons.  First, they have not alleged any "exclusionary conduct," defined as conduct

that goes "beyond the needs of ordinary business dealings, beyond the ambit of

ordinary business skill, and unnecessarily exclude[s] competition." <u>Barry Wright Corp.</u>

<u>v. ITT Grinnell Corp.</u>, 724 F.2d 227, 230 (1st Cir. 1983) (internal quotation and citation

omitted).  A firm's sale of its product at low prices is only "exclusionary" when it "harms

the competitive process." <u>Town of Concord v. Bos. Edison Co.</u>, 915 F.2d 17, 21 (1st

Cir. 1990).  That harm occurs when the "competition's basic goals—lower prices, better

11

products, and more efficient production methods"—are obstructed. Id. at 22. Put another way, I must ask, "[w]as [defendants'] conduct reasonable in light of [their] business needs or did it unreasonably restrict competition?" Barry Wright Corp., 724 F.2d at 230. According to defendants, the complaint alleges they sold cranberry juice concentrate at low prices, and nothing more. That, they say, is not "exclusionary."

The correct measure of defendants' cost is its "variable" or "incremental" cost—the cost of producing each additional unit. Id. 232. If the price of sale is below the variable cost, it raises a red flag because the pricing is economically irrational; it would be better to discontinue production altogether than to continue selling products at below-cost prices. Id. True enough, plaintiffs do not identify defendants' variable cost, but they do show that in 2009, the year when defendants began holding auctions, the average amount per barrel OS paid to "B Pool" and independent growers in various states dropped sharply, but remained stable for "A Pool" members.[9] Chart 1, TAC ¶ 27. It also shows a sharp drop in the average per gallon price of cranberry juice concentrate in 2010. Chart 2, id. ¶ 29. The structure of the auctions also strengthens plaintiffs' claim. OS controlled the quantity allotted to each bidder and the price each bidder paid. Of course, these facts are not conclusive. But at the motion to dismiss stage, where plaintiffs have not had the benefit of discovery, they are sufficient to plausibly infer exclusionary conduct.

---

[9]For example, in 2008, independent cranberry growers in Wisconsin and Massachusetts received, on average, $70 per barrel. In 2009, they received $37 per barrel. In 2008 and 2009, "A Pool" growers received $60 and $64 per barrel, respectively. "B Pool" growers received $52.60 and $26.37 during that same time period, nearly a fifty percent reduction in per barrel price in 2009.

Second, defendants contend plaintiffs have not suffered an "antitrust injury," an injury that occurs "by reason of [something] forbidden in the antitrust laws." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488-89 (1977).  OS may have sold concentrate at prices lower than "B Pool" members and independent growers prefer, defendants claim, but that does not establish an antitrust injury.  See Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 337-38 (1990).  At the motion to dismiss stage, though, "the question is not whether antitrust injury indeed occurred but whether plaintiffs allege facts from which antitrust injury can be inferred."  In re Mushroom Direct Purchaser Antitrust Litig., 514 F. Supp. 2d 683, 696 (E.D. Pa. 2007).  Plaintiffs have done so here.  They claim defendants' predatory pricing has led growers to join OS or exit the market.  TAC ¶¶ 53-54, 89-90.  And they allege an injury to consumers that arises from decreased output due to departures from the market.  Id. ¶ 55.   That is enough to survive a 12(b)(6) motion.

## 2.     Attempted Monopolization[10]

To demonstrate attempted monopolization, plaintiffs must prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).  For the reasons stated above, plaintiffs have alleged anticompetitive conduct.  Specific intent to monopolize may be inferred from a finding that a defendant acted in bad faith.  CVD, Inc. v.

---

[10]Plaintiff and defendant make the same arguments for or against dismissal of the attempted monopolization claim as they make with respect to the actual monopolization claim.

13

Raytheon Co., 769 F.2d 842, 851 (1st Cir. 1985).  Here, plaintiffs have alleged

sufficient facts to show that defendants, by structuring the auctions as they did, acted in

bad faith.  Finally, for the reasons articulated in footnote 8 supra, plaintiffs have alleged

a "dangerous probability" that OS will achieve monopoly power.  The attempted

monopolization claim survives as well.

> **I.    Count IX: Monopsonization and Attempted Monopsonization in
> Violation of the Sherman Act, 15 U.S.C. § 2 ("B Pool" Members and
> Independent Growers)**

The same legal standard applies to monopolization and monopsonization claims.

Weyerhauser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 321-22

(2007).  Accordingly, the same result obtains for Count IX as for Count VIII.

> **J.    Count X: Conspiracy to Monopolize and Monopsonize in Violation of
> the Sherman Act, 15 U.S.C. § 2**

Plaintiffs claim OS and OSB conspired "to depress, fix and stabilize the price of

fresh and processed cranberries."  TAC ¶ 130.  Defendants concede OSB is a wholly

owned subsidiary of OS but argue that a parent company cannot conspire with its own

subsidiary.  Mem. in Supp. at 10.  In Copperweld Corp. v. Independence Tube Corp.,

467 U.S. 752, 771 (1984), the Supreme Court held that a parent company and its

subsidiary are a "single enterprise" for the purposes of § 1 of the Sherman Act.  Count

X arises under § 2 of the Sherman Act,[11] but Copperweld's reasoning is still useful.  A

---

[11]Defendants direct the court to the First Circuit's purported affirmance of a District of Puerto Rico court's opinion which stated that Copperweld "applies to both Section 1 and Section 2 claims." Mem. in Supp. at 10 (quoting Sterling Merch., Inc. v. Nestle, S.A., 724 F. Supp. 2d 245, 273 (D.P.R. 2010), aff'd 656 F.3d 112 (1st Cir. 2011)).  But the First Circuit affirmed on the alternative ground that plaintiff lacked standing because it could not demonstrate an "antitrust injury"; it did not extend Copperweld to section 2 claims.  See Sterling Merch., Inc., 656 F.3d at 115, 120-21.

claim for conspiracy to monopolize requires an agreement between two separate

entities.  See 15 U.S.C. § 2 ("Every person who shall . . . conspire with any other

person or persons . . . shall be deemed guilty of a felony. . . .") (emphasis added).  If a

parent and subsidiary do not provide the plurality of actors necessary for § 1 liability,

why do they do so for § 2 liability?

I hold they do not.  Generally, "[i]f the parent owns a controlling interest in [the]

subsidiary and effectively makes all of [its] decisions, then the firms should be treated

as part of a single entity and Copperweld should apply."  Herbert Hovenkamp, Federal

Antitrust Policy 204 (4th ed. 2011).  By any reckoning, that is the case here.  OS wholly

owns OSB, and plaintiffs concede that the Board of Directors and executive

management teams for both organizations are "identical."  TAC ¶ 10.  Plaintiffs also

concede that OS's Board implements policies that increase the profit margins of the

branded products.  Id. ¶ 76.  Given their overlapping ownership, personnel, and

economic interests, OSB is not a separate entity from OS.  I therefore conclude that

Count X cannot succeed because plaintiffs have not alleged an agreement between

two separate legal persons.[12]

### K.    Count XI: Conspiracy to Fix Prices in Violation of the Sherman Act, 15 U.S.C. § 1 ("B Pool" Members and Independent Growers)

Count XI is squarely foreclosed by the holding of Copperweld and therefore fails.

---

[12]Plaintiffs state that they have not alleged a conspiracy between OS and OSB, but between OS and its Board of Directors.  First, Count X describes a conspiracy between "the Defendants."  TAC ¶ 130. Plaintiffs have not named any members of OS's Board as defendants, so I plausibly infer a reference to OS and OSB.  Second, assuming plaintiffs are correct, their claim still fails because Copperweld's reasoning applies to corporate boards and management as well.  Copperweld Corp., 467 U.S. at 769; see Shaun P. Martin, Intracorporate Conspiracies, 50 Stan. L. Rev. 399, 399 (1998) (noting that "courts have almost uniformly rejected civil intracorporate conspiracy allegations").

Copperweld Corp., 467 U.S. at 471.

**L.    Count XII: "All Statutes" ("B Pool" Members and Independent Growers)**

Because Count XII does not allege any cause of action not already alleged elsewhere in the complaint, it is dismissed.

**M.    Count XIII: Retaliation against Plaintiffs Barry K. Winters d/b/a BKW Farms and Paul D. Sogn d/b/a/ Witersogn Farms, in Violation of Massachusetts General Laws Chapter 93A**

Plaintiffs Barry K. Winters and Paul D. Sogn individually entered into a three-year "Cranberry Marketing Agreement" ("CMA") with OS.  TAC ¶ 147-48.  In a separate count, they claim that after the complaint was filed, OS sent them a letter terminating the CMAs because Winters and Sogn are named plaintiffs in this action.  Id. ¶ 150. The termination, they say, is a retaliatory, intimidating, and coercive business tactic in violation of Massachusetts General Laws, Chapter 93A.  Id. ¶ 151.

To establish 93A liability for a business practice, plaintiffs must show the practice (1) is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes substantial injury to consumers, competitors, or other businesspeople.  Mass. Eye & Ear Infirmary, 552 F.3d at 69 (quotation and citation omitted).  Plaintiffs state their 93A claim is premised on the standard of fairness contained in the Agricultural Fair Practices Act ("AFPA"), 7 U.S.C. §§ 2301-06.  Mem. in Opp. at 11.  But the AFPA does not appear in the complaint; plaintiffs raise it for the

16

first time in their opposition to defendants' motion to dismiss.  Because I may only

consider material in the pleadings at the motion to dismiss stage, I may not accept this

standard of unfairness.  See N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC

Inc., 537 F.3d 35, 57 (1st Cir. 2008).  Defendants' actions must be measured against

another definition of fairness.

> Generally,
>
> [a] simple, or even intentional, breach of contract is insufficient in itself to
> constitute an unfair or deceptive trade practice under Chapter 93A.
> Rather, the breach must be knowing and intended to secure unbargained
> for benefits to the detriment of the other party. The breaching party's
> conduct must exceed the level of mere self-interest, rising instead to the
> level of commercial extortion or a similar degree of culpable conduct.

City of Revere v. Bos./Logan Airport Assocs., L.L.C., 416 F. Supp. 2d 200, 208-09 (D.

Mass. 2005) (internal quotations and citations omitted).  The question, then, is whether

plaintiffs allege garden variety breach of contract or more nefarious misconduct.[13]

Plaintiffs claim defendants terminated the contracts to, inter alia, intimidate and coerce

them, frustrate the pending litigation, and discourage other "B Pool" members from

joining the suit.  Those are not "bargained for" benefits, and they are certainly to

plaintiffs' detriment.  I therefore conclude that plaintiffs have stated a 93A claim within

the "penumbra" of the established standard of unfairness for breach of contract.  Count

---

[13]Defendants contend the letter OS sent merely informed Winters and Sogn that OS would not
renew the CMAs after they expired.  They claim there is nothing unfair about exercising a right not to
renew a contract.  Mem. in Supp. at 19 (citing PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d
915, 918 (Mass. 1975) (holding a refusal to deal, without a showing of a monopolistic purpose, is not an
unfair trade practice under 93A)).  I am not persuaded.  The termination letters state that OS has the
right to non-renew the agreements, but they also state that OS is terminating them effective January 1,
2013, before their August 31, 2013 expiration date.  Docket # 44-2, Exs. 22-23.  Thus, what occurred
appears to be a termination rather than a non-renewal.

XIII survives.

## IV.   Conclusion

Defendants' motion to dismiss (Docket # 47) is ALLOWED IN PART and DENIED IN PART.  Counts IV, VIII-IX, and XIII may proceed.  All other claims are DISMISSED.  Defendants' motion for sanctions (Docket # 45) is DENIED.  Defendants' miscellaneous motions for leave to file a reply or supplemental memorandum (Docket ## 50, 54, 55, and 73) are ALLOWED.

Defendants' motion to stay their response to plaintiffs' motion for partial summary judgment (Docket # 61) is DENIED AS MOOT.  Because plaintiffs' motion for partial summary judgment (Docket # 57) is based on Counts I-III, which are now dismissed, it is also DENIED AS MOOT.


_____ May 2, 2014 _____          _____ /s/Rya W.  Zobel _____

     DATE                                    RYA W. ZOBEL
                      UNITED STATES DISTRICT JUDGE