# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

.

**Barry K. Winters d/b/a BKW Farms,**        **Civil Action No. 1:12-CV-12016-RWZ**
**Stacy Preston Winters,**
**Paul D. Sogn and Rachelle D. Sogn d/b/a**      **Honorable Rya W. Zobel**
**Wintersogn Farm, LLC**
**Michael A. Webb,**                   **January 6, 2015**
**Rickard W. Jackson,**
**Jackson Farms, Inc.,**
**James M. Schaer,**
**Julie A. Schaer,**
**Scott R. Vierck,**
**Fred P. Bussmann,**
**John L. Meyer,**
**John L. Meyer Cranberries, Inc.,**
**Christian M. Bussmann, and**
**Deanna M. Bussmann,**
**Charles V. Goldsworthy and Timothy R.**
**Goldsworthy d/b/a ThunderLake-Tomahawk**
**Cranberries, Inc., and**
**H.E. Querry, Inc., on behalf of themselves and**
**all other similarly situated as a class,**

                   **v.**

**Ocean Spray Cranberries, Inc., an agricultural**
**cooperative, and**
**Ocean Spray Brands, LLC, a limited liability**
**company,**

## PLAINTIFFS MOTION FOR SUMMARY JUDGMENT ON COUNTS IV AND VIII ON LIABILITY ONLY WITH A SEPARATE HEARING ON DAMAGES TOGETHER WITH A LIST OF UNDISPUTED MATERIAL FACTS

Plaintiffs hereby move for summary judgment on Counts IV and VIII on grounds set forth in

the following memorandum.

**Ia.**                  **STANDARD FOR SUMMARY JUDGMENT**

A motion for partial summary judgment requires that the movant show that there is no

genuine dispute as to any material fact and the movant is entitled to judgment  as a matter of law.

For the reasons that follow plaintiffs have met this standard.

**Ib.**             **STATEMENT OF UNDISPUTED MATERIAL FACTS**

Attached hereto is our Statement of Undisputed Material Facts which, because of the self-proving authenticity of the Exhibits that cite said facts, also includes a complete list of said exhibit numbers.  And the facts stated herein cannot be disputed because 14 out of the 18 facts are from Ocean Spray's own documents;  2 of the remaining  facts are affidavits from farmers about their own farms; 1 is an exact copy of an existing contract and 1 is an exact copy of the Final Judgment of  this court in 1957.

**II.**             **SUMMARY OF THE ARGUMENT**

This summary judgment motion is based on undisputed evidence that clearly shows that defendant has violated M.G.L. c.93A, and the Sherman Act. The evidence proves that Ocean Spray has obtained, or is dangerously close to, a monopoly which is squeezing out the remaining independent cranberry farmers.  None of the farmers whose rights are being violated by defendants want to be the first generation of their families to lose the farm.

Ocean Spray proudly proclaims, on its signature product, Cranberry Juice Cocktail,  entitled, "Meet Our Growers" that the featured individuals are now in the 7th generation.  **Exhibit  1**.  And many of the independent farmers who are represented in this case own bogs handed down to them by their forefathers.  Named plaintiffs Charles v. Goldsworthy and his son, Timothy R. Goldsworthy themselves are 2nd and 3rd generation farmers, with the 4th  generation of their family having already arrived.  It is the nature of the industry to hand down the farm from one generation to the next.  But, defendant, despite its proud proclamation, has taken actions that put said inheritances in jeopardy.  As the affidavit of Timothy R. Goldsworthy, an independent farmer whose crops are delivered to Ocean Spray to sell, shows, he has done everything he

possibly can to survive the economic pressure being put on him by defendant's failure to use its best efforts to sell his crops at the prevailing market price. **Exhibit 2**.

Plaintiffs are entitled to summary judgment on Count IV because defendant has a duty under its contract with independent handlers such as Cranberries Limited, **Exhibit 3,** (which is responsible for the sale of certain independently grown cranberries), to sell the cranberries of the independent handlers at the current market price. Instead, they fail to do that by, *inter alia,* the announcement that each "auction" will be at 15% lower than the last price at the preceding "auction" **Exhibit 4.** This alone proves conclusively that they do not seek to get the prevailing market price but, rather, that they deliberately undermine that price.

Its contracts with the independents such as Cranberries Limited (CLI) require it to sell the cranberries after it processes them into cranberry juice concentrate. CLI has many farmers who contract with CLI to sell 100% of their crop. CLI has a contract with Ocean Spray to have its farmers deliver 100% of their cranberries directly to Ocean Spray. Ocean Spray then pays CLI who takes a commission of 10% and pays the rest to the farmers. Then, as shown above and below, Ocean Spray undercuts the current market price by the prices it sells at said "auctions". Ocean Spray does not seek to obtain the current market price at said auctions. Instead, it alone sets a price at its "auctions" that is below what it could obtain at a fair auction where people would actually place bids, instead of Ocean Spray arbitrarily setting whatever price it chooses. That price was over $60 per gallon for concentrate before Ocean Spray conducted its first of said "auctions", **Exhibit 5**. And Ocean Spray all by itself decided to, and did, sell at its first "auction", concentrate at $33.34 per gallon, about one-half of the previous price. Ocean Spray's announcement of prices are the actual selling prices because nobody is allowed to place a bid on price at any of said "auctions". Ocean Spray then changes the price for later delivery,

after the quantity offered at the opening price is bought by people who are participating in the

"auction".

Ocean Spray publishes the way its "auctions" are conducted, by questions and answers, on its

website which is: http://www.cranberryauction.info/QAs.aspx . **Exhibit 5A** hereto, shows a

few of such questions and answers. Question 1.14 describes how the auction process works.

Question and answer 1.16 shows that the starting prices are not the prevailing market price of

the product, as it states:

**Starting prices do not represent Ocean Spray's view of the price for cranberry concentrate.**

Question 1.22 shows that buyers are prohibited from obtaining more of the product by

bidding more money, because, as stated, **For each round of the auction, each bidder has an**

**eligibility that represents the maximum total number of gallons that the bidder may bid . . .**

**."** and **Eligibility cannot increase as the auction progresses**.

This proves, conclusively, that no buyer can obtain more quantity of the product by bidding a

higher price. Further proof is shown by the example in Question 1.22 that states that **if a**

**"bidder chose to bid 4000 gallons on contract 1 . . . [t]his bidder's eligibility would decline**

**to 4,000 gallons for round 2".**

But Ocean Spray is not free to sell the product at whatever price it pleases. When it fails to

seek the prevailing market price it is in violation of an "established concept of unfairness", which

shows that it is in violation of M.G.L. c.93A. Under *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y.

88, 118 N.E. 214 (1917) (Court of Appeals, N.Y., Cardozo, J.) it has a duty to use its best efforts

to sell at whatever price the market will pay. By not doing that, it violates the implied covenant

of good faith and fair dealing in every contract. The following facts establish violations of

M.G.L. c. 93A as alleged in Count IV on behalf of independent farmers to whom defendant owes

a duty to sell their cranberries at the current market price, instead of undermining that price.  The essential facts which entitle plaintiffs to summary judgment in this case can be summarized as follows.  Ocean Spray is conducting sham "auctions" every three months during which it violates "established concepts of unfairness" which, as shown later, are required by the analysis of c.93A adopted by the United States Court of Appeals for the First Circuit and by the Massachusetts Supreme Judicial Court, that proves a violation  of M.G.L. c.93A.  In each case, Ocean Spray has contracted to sell the entire crop of cranberries of each farmer (1) and it violates the "established concept of unfairness" when it conducts "auctions" at which nobody bids price **Exhibit 6** (2) and at which the only party who sets a price is Ocean Spray (3) and because said price, which has been set solely by Ocean Spray during the past five years, is now less than one-half of the price Ocean Spray set at the first such "auction".

The failure to allow any bidding on price; the arbitrary setting of a price at each succeeding "auction" that is 15% below the last price at the previous "auction"; and the practice of setting the first price at an "auction" that is lower than a later price at the same "auction" proves on its face that it could have started at the higher price to begin with.  For example, at the "auction" Ocean Spray held on October 29, 2014, **Exhibit 7,**  it set its opening price at $15.16 and after it sold the quantity it "allowed" people to buy, it then set the next round at $16.54 and after it sold the quantity it "allowed" people to buy it then set the next round at $16.79.  These succeeding prices at a higher amount than the previous price at the same "auction" prove conclusively that it could have started at the highest price it set at the "auction", $16.79, because people paid that price for the quantity Ocean Spray "allowed" them to buy. Because Ocean Spray did not do that, it is unknown how much people would have paid if the price were set still higher, but it is clear that Ocean Spray did not seek to get the highest price it might have gotten.  Simply

stated, defendants, by structuring the auctions as they do and its constant sale of cranberry juice concentrate at the "auction" price, and by starting each auction at 15% less than the last price at the prior "auction " are in bad faith.

### III.        OCEAN SPRAY FACED A SERIOUS PROBLEM

**A.**       Here is what Ocean Spray told its members in its annual report for the year 2007:

> Demand for our products is growing at twice the rate of future
> crop output.  Now the challenge is to find effective new ways to
> encourage more fruit to enter our cooperative.  **Exhibit 8**.

**B.**       Here is what Ocean Spray's Chairman, Fran Podvin, said about Ocean Spray's problems prior to beginning its plan in July, 2009 to deliberately undercut the market for independently grown cranberries:

> in 2007 and 2008, we were greatly challenged with loss of
> membership, lack of adequate fruit supplies, and leakage of
> value created by Ocean Spray to the independent growers.
> Growers were asking me why should they belong to Ocean
> Spray and give up higher prices on the outside with no hope
> of accessing the value of the brand owned by the cooperative.
> **Exhibit 9**.

**C.**       Here is what Ocean Spray's Vice President of Strategic and Business Development said about Ocean Spray's need for more cranberries, on January 14, 2009,

> "We desperately need more fruit", and he said, "The demand for
> cranberries is outpacing Ocean Spray's ability to turn out the fruit
> from bogs already in production", as he outlined Ocean Spray's
> plans to invest $90 million to create new cranberry bogs in New
> Brunswick, Canada. **Exhibit 10.**

**D.**     Here is what Chairman Fran Podvin stated at Ocean Spray's annual meeting on February 25, 2009:

> "The new cranberry acreage is needed by the cooperative to supply
> growth of Our business".  Further, he stated that, "Retention of growers. . .
> and expanding acreage are the principle challenges facing us today".
> **Exhibit 11**.

**E.**     Here is what Ocean Spray's Chief Executive Officer, Randy Papadellis stated

at Ocean Spray's annual meeting on February 25, 2009:

> "We have lost 29 points of crop share in the last 20 years.
> **If that trend continues, we are out of business**".
> **Exhibit 12**. (emphasis added)

**IV**.                              **ARGUMENT**

**THE ABOVE STATEMENTS SHOW THAT OCEAN SPRAY WAS
DESPERATELY SHORT OF CRANBERRIES AND THAT IT
WAS LOSING MEMBERS BECAUSE THEY COULD GET PAID
MORE MONEY FOR THEIR CRANBERRIES IF THEY LEFT
OCEAN SPRAY**

**SO, HERE IS WHAT THEY DID ABOUT IT**

**A.**   The above statements, by Ocean Spray's own officials, in its own documents

attached as exhibits hereto, constitute the reasons why Ocean Spray set out to take the actions

described below which prevented Ocean Spray's own growers from leaving the cooperative since

they could no longer get more money for their cranberries by leaving Ocean Spray and caused

many independent growers to join Ocean Spray because their only hope of survival as a business

was if Ocean Spray eventually allowed them to become A Pool members.  A Pool members'

cranberries are used to make Ocean Spray branded products and A Pool members are paid more

than double the amount that B Pool members are paid for their cranberries.

**B.**     **THE STAGE IS SET FOR OCEAN SPRAY'S PHONY
             "AUCTIONS"**

So it was that Ocean Spray devised its plan to undercut the independent market for

cranberries so low that Ocean Spray's members would no longer be able to get more money for

their cranberries by becoming independent and therefore they would remain in Ocean Spray.

And so that independents would not be able to survive at such low prices and would be caught

between being slowly forced out of business or accepting membership in Ocean Spray's newly created B Pool  which put them into the position where they were still getting the same low price for their cranberries but could cling to the hope that someday they would be put out of their economic misery by being elevated to Ocean Spray's A Pool.

At the outset, it should be noted that in its business and in all of the examples below, Ocean Spray does not buy any cranberries from anyone.  Rather, it acts as a broker by taking possession of the cranberries, processes them into a product like cranberry juice concentrate and then sells the concentrate and after taking its share of the selling price to cover its costs of handling and processing the cranberries, and any profit, it then pays the remainder to the person who delivered the cranberries to it.  So too, the several independents shown herein deliver their cranberries to Ocean Spray under contracts between Ocean Spray and "handlers" such as Cranberries Limited, who, in turn, contract with independent growers to deliver their crop to Ocean Spray to process and to sell.  So, Ocean Spray never loses any money on such sales.

When Ocean Spray began its "auctions" in July of 2009 it announced that nobody could bid a price at any of its "auctions" Exhibit Six**,** and that the procedure would be as follows. Instead, Ocean Spray would announce how many gallons of cranberry juice concentrate it was willing to sell at the first part of that day's "auction".  Then buyers would be allowed to indicate, via telephone or online, how many gallons they were willing to buy at that announced price. The buyers are given a set number of minutes to enter their quantities.  And then Ocean Spray, if there are buyers for more than the quantity Ocean Spray announced were available at the announced price, decides to whom they will sell the announced quantity. Then, Ocean Spray would announce how many gallons it was willing to sell at a different price, sometimes higher than the previous price and sometimes lower, almost always ending in some amount of cents and

almost never ending in 00, making it  look as though there had been some real bidding or calculation that resulted in such numbers. When it sold the amount of concentrate it wished to sell at that "auction" the "auction" ended, Exhibit 5A**.** It has also announced that it would continue to sell at the closing price of the last "auction" until the next "auction" which it also announced would open at 15% lower than the closing price of the last "auction".  In this manner no logical buyer of concentrate would be willing to pay more than what Ocean Spray was selling the concentrate for.  The processors who make the juice, as a matter of plain common sense, in order to remain competitive, will not pay any more to other cranberry sellers for cranberries to make juice than it would cost them to make the juice from Ocean Spray's concentrate. At the beginning of the first "auction, in July, 2009,  Ocean Spray immediately set an opening price of cranberry juice concentrate, which is the only product it sells at said "auctions", at less than half of the previous market price for that product, Exhibit  Five.  A real auction would have started at approximately the previous price for the product and then would have accepted orders at that price if there were enough real bidders.  If there were too many bidders and too few product, that price would have gone up.  If there were not enough bidders to buy the amount offered, the price would be reduced until the quantity was purchased.  That is the way real auctions work because the purpose is to find the real market price at which buyers will buy all of the product being offered.  With Ocean Spray's "auctions" there is no attempt to find out what the buyers would have paid in a proper auction, but, rather, the "auction" only serves to give notice of the price at which Ocean Spray has decided to sell the quantity it wanted to sell.

   The Massachusetts Supreme Judicial Court held that third party beneficiaries such as Goldsworthy and Teske have the right to sue on a contract such as the Cranberries Limited contract with Ocean Spray, of which they are third party beneficiaries. In *Choate, Hall and*

*Stewart v. SCA Services, Inc.,* 378 Mass. 535 (1979) the SJC held that 3rd party beneficiaries

could sue on the underlying contract, Kaplan, J.  In *Rae v. Air-Speed, Inc. & Others,* 386 Mass.

187 (1982) the SJC held that it reiterated the holding in the *Rae* case cited above.

## V.    CONSEQUENCES TO INDEPENDENT GROWERS

The announcement by Ocean Spray that each succeeding "auction" would start at 15% lower

than the last price at the preceding auction assured that no one would pay more than Ocean

Spray's "auction" prices and that no one would make any long term contracts with anyone at a

higher price than that announced by Ocean Spray.  Some independent growers refused to sell to

their previous outlets because they could not cover their cost of production of their cranberries

by selling at the prices  demanded by their previous outlets.  Ocean Spray announced that it

would accept growers into its B Pool with a promise that at some later date it could, would,

might transfer said members into it's A Pool which had been receiving over $60.00 per barrel.

Exhibit Two, para. 13-16,  **Exhibit 13,** Affidavit of Richard Teske, para. 12-15.  As a last resort,

some growers joined Ocean Spray's B Pool.  After the first year, Ocean Spray's Chairman, Fran

Podvin, announced at Ocean Spray's annual meeting on March 10, 2010 that: "We did not lose a

member grower this past year.  We actually added approximately 80 new members this past

year".  **Exhibit 14**. So, by its own admission, Ocean Spray's actions stopped the departure of

some of its members and added 80 new members to the cooperative.

Ocean Spray's own figures as shown in Chart 1 below, prove that from the year before the

first "auction" and now, it has gone from having 62.3% of the entire U.S. cranberry crop to 76%

in 2012, which is the last year such information is available.  These figures include the amount of

cranberries delivered to Ocean Spray by its B Pool growers. Based on reported sales of

concentrate usually totaling 660,000 gallons per year, and based on the industry figure of 1.66

gallons of concentrate from a barrel of cranberries, and based on the fact that the figures published by Ocean Spray are for cranberries that are used for "patronage fruit only" (Ocean Spray's description of cranberries that are only used to produce Ocean Spray branded products) the figure of B Pool cranberries must be added to the "patronage fruit" to reach the actual total amount of the cranberry market admittedly controlled by Ocean Spray.  Uncounted in the figure we present is the amount of independently grown cranberries that are delivered to Ocean Spray because of contracts with independent handlers such as Cranberries Limited (estimated to be 500,000 barrels for the year 2012). Chart 1 (Ocean Spray share of cranberry production in the United States in 2012) includes 400,000 barrels of the estimated B Pool quantity of cranberries, because it would take 400,000 barrels of cranberries to produce the estimated sales by Ocean Spray of 660,000 gallons of concentrate. **Exhibit 15**, page 48 of the Ocean Spray Annual Report for 2008 shows that it received 4,900,000 barrels of cranberries used in its Ocean Spray branded products which hereinafter will be referred to as "patronage fruit".  The United States Department of Agriculture reported that the cranberry crop in 2008 was 7,860,263, therefore, Ocean Spray's share of  cranberry production in the United States in 2008 was 62.3%.  **Exhibit 16**, page 46 of the Ocean Spray annual report for 2012 shows that it received 5,638,000 barrels of cranberries for use in its Ocean Spray branded products together with the estimated figure of 400,000 barrels of cranberries from its B Pool members that it claims it only uses to make concentrate, for a total of 6,038,000 barrels delivered to it in 2012.  The United States Department of Agriculture reported that the cranberry crop for 2012 was 7,937,249 barrels of cranberries.  Ocean Spray therefore received at least 76% of the United States cranberry crop in 2012.                    **CHART 1**

2008          62.3%

2012          76.0%

Market share in the relevant market (in this case the entire United States production of

cranberries)  typically is considered the most important factor in assessing whether market power

exists.  *United States v. Microsoft Corp.*, 253 F.3d 34, 56-57  (D.C. Cir. 2001).  Although no

concrete rules exist, Judge Learned Hand famously noted that a market share of 90%  "is enough

to constitute a monopoly" but "it is doubtful whether sixty or sixty-four percent would be

enough" and "certainly thirty-three per cent is not."  Other courts have said that market power is

rare at market shares less than seventy percent,  *Exxon Corp. v. Berwick Bay Real Estate*

*Partners,* 748 F.2d 937, 940 (5th Cir. 1984), that "a share significantly larger than 55% is

required to show monopoly power, *United States v.Dentsply Int'l, Inc.,*  399 F.3d 181, 187 (3d

Cir. 2005), and that "a share of  75% -80% is "more than adequate to establish a prima facie

case" of monopoly power.  *United States v. Dentsply,*399 F.3d at 188. *Eastman Kodak Co. v.*

*Image Technical Servs.,* 504 U.S. 451, 481 (1992) (It is generally accepted that a market share in

excess of 70% can establish a *prima facie* finding of monopoly power.).

In order to satisfy this element of a successful claim for monopolization under Section 2 of

the Sherman Act , the acquisition or maintenance of monopoly power must be the result of

"competition on some basis other than the merits." *Broadcom Corp. v. Qualcomm, Inc.,* 501 F.3d

297, 308 (3d Cir. 2007)(citing *Verizon Commcn's Inc. V. Law Offices of Curtis V. Trinko, LLP,*

540 U.S. 398, 407 *(*2004). Any conduct by the defendant that secures market share by means

other than the competitive merits of the defendant's product may qualify as anticompetitive.

*Univac Dental Co. v. Dentsply Int'l,* 2008 U.S. Dist. LEXIS 46,910, at 16(M.D. Pa. June 17,

2008).  As shown below, there is no valid business basis for defendant's breach of its duty of

good faith and fair dealing in the contracts that it has made for the sale of independently grown cranberries.

The United States Supreme Court has long held that monopoly power is "the power to control prices or exclude competition". *U.S. v. E. I. DuPont De Nemours & Co.,* 351 U.S. 377, 391 (1956). "The offense of monopoly under 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident" *Eastman Kodak Co. v. Image Technical Services, Inc.* 504 U.S. 451 (1992) quoting *United States v. Grinnell Corp.*, 384 U.S. 563 at 570-571 (1966). "The second element of a 2 claim is the use of monopoly power 'to foreclose competition, to gain a competitive advantage, [504 U.S. 451, 483] or to destroy a competitor.' " *United States v. Griffith,* 334 U.S. 100, 107 (1948). "If [defendant]. . .adopted its . . .policies as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated 2.". *Grinnell Corp.,* 384 U.S. at 570-571; *United States v. Aluminum Co. of America,* 148 F.2d 416, 432 (CA2 1945); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*  472 U.S. 585, 600-605 (1985).

As shown below, Ocean Spray acquired its monopoly position by the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident, and plaintiffs are entitled to summary judgment on Count VIII for its willful monopolization of the cranberry industry.

**VI.**          **THE ACTIONS BY OCEAN SPRAY SHOWN ABOVE
                 VIOLATE M.G.L. c.93A AND THE SHERMAN ACT**


**A.**     **OCEAN SPRAY'S SALES OF CRANBERRY JUICE
           CONCENTRATE DURING THE YEAR AND AT AUCTION**

**ALL VIOLATE M.G.L. c. 93A AND THE SHERMAN ACT**

Ocean Spray has made contracts with numerous independent companies that market the cranberry crop of independent growers such as Timothy R. Goldsworthy whose affidavit is attached hereto as Exhibit Two**.**  Payment for said cranberries is based on the prevailing market price of the concentrate that Ocean Spray converts them into.  But, as Mr. Goldsworthy's affidavit shows, Ocean Spray is using his cranberries to undercut the market and it takes no loss on said undercutting because it passes the loss on to the helpless grower who has no say in the price at which his cranberries  are sold.  Exhibit Two, para. 7-15.

**ALL OF OCEAN SPRAY'S SALES AT LOWER THAN WHAT THE MARKET WOULD PAY DEMONSTRATE UNFAIRNESS AND ARE ILLEGAL BECAUSE THEY VIOLATE M.G.L. c. 93A (COUNT IV) AND DEMONSTRATE BAD FAITH IN VIOLATION OF THE SHERMAN ACT (COUNT VIII)**

**The c. 93A Standard**:

This court ruled in this case in its Memorandum of Decision, May 2, 2014, at page 16:

To establish 93A liability, plaintiffs must show the practice

(1) is within at least the penumbra of some common-law, statutory or other established concept of unfairness;

(2) is immoral, unethical, oppressive, or unscrupulous; and

(3) causes substantial injury to consumers, competitors, or other businesspeople. Mass. Eye & Ear Infirmary, 552 F.2d at 69. Slip opinion at 16.

**1)      Ocean Spray's  online auction "is within at least the penumbra of some common-law, statutory or other established concept of  unfairness**

**a.**      *In Commonwealth v. Fremont Inv. & Loan*, 452 Mass. 733, 747-48, 897 N.E.2d

548 (2008), the Supreme Judicial Court of Massachusetts invoked, under Chapter 93A, the

standards contained in a consent agreement secured by the Federal Deposit Ins. Corp.:

> The fact that the FDIC ordered Fremont to cease and desist from
> the use of almost precisely the loan features that are included in
> the judge's list of presumptively unfair characteristics indicates
> the FDIC considered that under established mortgage lending
> standards, the marketing of loans with these features constituted
> unsafe and unsound banking practice with clearly harmful
> consequences for borrowers. Such unsafe and unsound conduct
> on the part of a lender, insofar as it leads directly to injury for
> consumers, qualifies as 'unfair' under G.L. c. 93A § 2.
> 452 Mass. at 747-48.

Thus, the prior consent agreement in *Fremont* formed the basis for the court's conclusion that the

defendant's lending practices were unfair and a violation of Chapter 93A.  In accord are *In re*

*TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489, 496-97 (1st Cir. 2009) (FTC complaints and

consent decrees condemning as 'unfair conduct' specific behavior similar to that charged by

plaintiffs, could form the basis for Chapter 93A claim); *Schubach v. Household Finance Corp*.,

375 Mass. 133, 135, 376 N.E.2d 140 (1978) (FTC consent decree).  Therefore, the standards

contained in the 1957 consent agreement between Ocean Spray's predecessor corporation and

others with the United States Department of Justice can form the basis for plaintiffs Chapter 93A

claim, as analyzed below.

**b.**      **The concept of unfairness in a contract was established by Justice
Cardozo's opinion in *Wood v. Lucy, Lady Duff-Gordon* that requires
best efforts to sell a product produced by another.**

When Ocean Spray sells the cranberries of independents, 100% of their cranberries are

exclusively marketed by Ocean Spray. Consequently, Ocean Spray was obligated to use its best

efforts to maximize the returns to these growers. The "best efforts" rule has its origins in Justice

Cardozo's opinion in *Wood v. Lucy*.  Lucy was a "creator of fashions" whose endorsement made

clothing more valuable. Lucy entered into a contract with Wood in which Wood would have the

exclusive right, subject to her approval, to sell her endorsements to others, sell Lucy's designs or to license them. In exchange, Lucy would receive one-half of all profits and revenues. It was a renewable year-long contract.  Lucy went ahead and sold her endorsements elsewhere. Wood sued.  Wood argued that the contract was without consideration because it imposed no duty on Wood to do or abstain from doing anything. The court disagreed, and found that a promise to use "reasonable  efforts" is fairly implied in the contract, even without such an explicit term. The court emphasized that Lucy's sole compensation was profits resulting from Wood's efforts and therefore the parties must have intended that Wood use such efforts as to promote "business efficacy."

Over 1,000 cases cite *Wood v. Lucy.* In the cases read, this pattern emerges: when determining whether to impose an obligation of best or reasonable efforts (the two terms are used interchangeably), the court  looks to see if the contract makes sense and is generally equitable without such a term.  The online auction violates the common law requirement of best efforts.

A lawful agreement by either the seller or the supplier for exclusive dealing in the kind of goods concerned imposes, unless otherwise agreed, an obligation by the supplier to use best efforts to supply the goods and by the seller to use best efforts to promote the sale. Both Goldsworthy and Teske had contracts that gave Ocean Spray the exclusive right to sell their entire cranberry crops, Goldsworthy, Exhibit  Two, ¶7-11 and Teske, Exhibit Thirteen**,** ¶11, Ocean Spray violated the "best efforts" rule by returning to Goldsworthy and Teske the proceeds of their sale of the crops that was below 1) what had been paid in the years before the commencement of the sham auctions; 2) what Ocean Spray had a duty to try to obtain in the

market; 3) what was returned to Ocean Spray A pool growers who produced identical fruit; 4) the cost of production of Goldsworthy and Teske.

**c.      THE 1957 FINAL JUDGMENT IS AN "ESTABLISHED CONCEPT OF UNFAIRNESS"**

Inherent in every aspect of the Final Judgment,  **EXHIBIT 17,**  is the "established concept of unfairness", that is to protect the independent cranberry farmers from the behavior of Ocean Spray in its attempt to create a monopoly.

The concern about, and protection of, price levels in the cranberry industry by the United States Department of Justice in the Final Judgment is most clearly shown by its prohibition in part VI, (A) which stops the defendants from taking actions to ". . .<u>artificially raise , depress or stabilize market price levels of fresh or processed cranberries;"</u>.   And depressing market price levels of processed cranberries  is exactly what defendant is doing that must be stopped.

Plaintiffs seek redress for Ocean Spray's unfair practices actionable under Chapter 93A – not directly under the Final Judgment. In its Order, the Court granted Ocean Spray's motion to dismiss Counts III and V, agreeing with Ocean Spray that Plaintiffs were not parties to the Final Judgment and lack standing to enforce it. Order, pp. 7-8. But, Chapter 93A itself provides a cause of action and standing to sue to redress unfair trade practices; and there is substantial state and federal authority that the **standard** for determining whether a practice is unfair can be found by **reference** to a consent decree or judgment, such as the 1957 Final Judgment, or another statute; and nothing in Chapter 93A or the case law requires that the plaintiff have the right to enforce the underlying judgment or statute directly. Chapter 93A is "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." *Slaney v. Westwood Auto, Inc*., 366 Mass. 688, 322 N.E.2d768, 772 (1975), quoted in Memorandum of Decision dated May 2, 2014 at, p.9.  Chapter 93A claims may be based on a

statute that does not allow a private cause of action, or on claims that might not otherwise be

cognizable. *See Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st

Cir. 2000) (a practice may be deemed unfair if it is within at least the penumbra of some

common-law, statutory, or other established concept of unfairness," quoting *Atkinson v.*

*Rosenthal*, 33 Mass. App. Ct. 219, 598 N.E.2d 666, 670(1992). *Also see Morris v. BAC Home*

*Loans Servicing, L.P.*, 775 F. Supp. 2d 255, 258-59 (D. Mass. 2011) (violation of Home

Affordable Modification Program "that is deceptive or unfair could create a viable claim for

relief under Chapter 93A"); *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 684 F. Supp. 1138,

1143-44 (D. Mass. 1988) (Chapter 93A claim based on violation of Federal (Communications

Act).

   The sale of cranberry juice concentrate to other processors is even more anti-competitive

than  if Ocean Spray just sold cranberries to independent processors because independent

farmers do not have the ability to first process their cranberries and then sell it to independent

processors. Further unfair behavior is defendant's sales of said concentrate at prices far below

the basic cost of producing the cranberries.  Further, defendant has made contracts with certain

independent producers to take their cranberries and to pay for said cranberries based on the

prevailing market price for concentrate.  But defendant has destroyed the prevailing market price

for cranberries and for concentrate by selling them at prices far below the prevailing market price

as it existed before defendant created its phony "auction".  This behavior has left those

independent producers with no better place to sell their cranberries because the entire market

knows that defendant has enough cranberries in storage to supply the entire independent market

and therefore, no one will pay more than defendant's price. Exhibits Two and Thirteen.  So the

independents have no one else to whom they can sell their cranberries for any different price than

that price resulting from  Ocean Spray's sales of cranberry juice concentrate. Thus,  Ocean Spray

has obtained a monopoly of  the cranberry industry in the United States.

### 2.    The "Auction" Was Oppressive to Independent Growers.

The second requirement of the 93A standard is to show that the online auction was a practice

that was " immoral, unethical, oppressive, or unscrupulous." Suffice it to say that a practice that

causes the returns to growers to be significantly below the growers cost of production is

oppressive to those growers. (Goldsworthy, Exhibit Two, ¶ 14, Teske, Exhibit Thirteen, ¶ 14,) It

is also unethical and unscrupulous because the auction benefited the A pool growers and

encouraged them to remain with Ocean Spray by devastating the returns to independent growers.

### 3.    The "auction" caused substantial injury to competitors, or other business people

The third requirement of c. 93A is to establish that the online auction caused  "substantial

injury…to competitors, or other businesspeople." The independent growers are competitors of

Ocean Spray.  The damages are substantial. The returns to growers were in the range of $60/bbl

before the auction and about $20/bbl after the auction. This drop was devastating.  Furthermore,

the value of a marsh is directly tied to its productivity. The destruction of returns has required

some to sell marshes( Teske, Exhibit Thirteen**,**  ¶15,¶16) and others to take drastic steps to stay

in operation. (Goldsworthy Exhibit  Two**,** ¶ 16) Teske's vast experience in the cranberry industry

as an owner of cranberry marshes, a Chief Financial Officer of a cranberry processor and

marketer as well as his background as a CPA (Teske**,** Exhibit Thirteen**,** ¶ 1-9) qualify him as an

expert in the valuation of cranberry marshes. Furthermore, owners such as Teske and

Goldsworthy are considered    experts concerning the value of their own property. *Shane v.*

*Shane,* 891 F.2d 976, 982(1st Cir. 1989); *Witold K. Von Hennenberg v. Peter Generazio,* 403

Mass. 519,524, 531 N.E. 2d 563,566(1988);*Perpignani v. Vonasek,* 139 Wis.2d 695,(1987) 408

N.W. 2d 1.  Before the "auction", independent marshes were selling for $45,000-$60,000 per

acre (Teske, Exhibit Thirteen**,** ¶ 16). Currently an owner of an independent cranberry marsh

would be fortunate to receive $10,000 per acre because of the low return on cranberries from

independent marshes and banks' reluctance to finance purchases of independent cranberry

marshes due to the low return. (Goldsworthy, Exhibit Two**,** ¶ 17).

A few years ago the independent cranberry marshes could have been sold for $30,000 per

acre. Since the sale price of the marshes is directly related to the revenue anticipated from the

sale of cranberries the current price of an independent cranberry marsh is closer to $10,000 per

acre. And it is doubtful if anyone would pay that price since banks do not want to finance

cranberry property because of the low revenue from cranberry sales. (Goldsworthy, Exhibit Two**,**

¶17) This is a loss in value of at least $35,000 per acre. The loss to the Goldsworthy marshes (on

his 236 acres) is over $8 million. This is substantial damage.

### CONCLUSION

Because Ocean Spray has violated established concepts of unfairness , as enunciated in the

1957 Final Judgment and *Wood v. Lucy*, summary judgment is appropriate on count IV.  And

because all of the above constitutes "bad faith" prohibited by the Sherman Act, plaintiffs are

entitled to summary judgment on Count VIII.  Damages and any other remedy will be addressed

separately.

### REQUEST FOR EXPEDITED HEARING

Because many farmers are not able to continue in business much longer without relief from

defendant's actions described herein, plaintiffs urge the court to grant an expedited hearing.

**/s/ Arthur R. Miller**                  **/s/ Norman Jackman**
**Arthur R. Miller, Esq.**                **Norman Jackman, Esq.**
**University Professor, NYU School of Law**  **JACKMAN & ROTH LLP**
**40 Washington Square South, Room 430F**  **1600 Massachusetts Ave.Suite 502**
**New York, NY 10012**                    **Cambridge, Massachusetts 02138**
**(212) 992-8147**                        **(617) 682-8049**

**/s/Manuel C. Hernandez**                **/s/Frederick J. Carleton**
**Manuel C. Hernandez, Esq., Pro Hac Vice**  **/s/ Shala McKenzie Kudlac**
**Hernandez and Associates, LLC**         **Frederick J. Carleton, Esq.,**
**P.O. Box 979**                          **Pro Hac Vice**
**Bandon, Oregon 97411**                  **Shala McKenzie Kudlac, Esq.**
**(541) 347-2911**                        **Pro Hac Vice**
                                          **Carleton Law Offices**
                                          **P.O. Box 38**
                                          **Bandon, Oregon 97411**
                                          **(541) 347-2468**

### Certificate of Service

   I hereby certify that this document filed through the ECF system will be sent electronically to  the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants as of January 5, 2015.

<u>**/s/ Norman Jackman**</u>
Norman Jackman