UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 12-12016-RWZ


BARRY K. WINTERS, *et al.*

v.

OCEAN SPRAY CRANBERRIES, INC.


MEMORANDUM OF DECISION

October 31, 2017


ZOBEL, S.D.J.

In this action, some fifty plaintiffs allege that defendant Ocean Spray

Cranberries, Inc., ("Ocean Spray"), an agricultural cooperative, has unlawfully

manipulated the price of cranberry juice concentrate and discriminated against "B Pool"

members of the cooperative. Plaintiffs identify themselves as about four B Pool

growers and approximately forty-seven independent cranberry growers located in

Oregon, Wisconsin, and Massachusetts.[1]

In their Fourth Amended Complaint, plaintiffs bring three claims: (1) that Ocean

Spray engaged in unfair and deceptive acts in violation of Massachusetts General Laws

chapter 93A, § 11, thereby injuring the independent growers (Count I); (2) that Ocean

---

[1]     The exact number and identity of the plaintiffs in this case is unclear. One hundred three
parties are listed on the docket, while eighty-six appear on the Fourth Amended Complaint; not all shown
on the Fourth Amended Complaint are on the docket. Within the Fourth Amended Complaint, under
"Parties," the plaintiffs identify themselves using fifty-one bullet points, though some of these bullet points
contain more than one name. See Docket # 253, at 6–7. For purposes of this motion, I count each of the
bullet points in the "Parties" section as a plaintiff, totaling fifty-one plaintiffs.

Spray engaged in a pattern of anti-competitive conduct in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, thereby injuring both B pool and independent growers (Count II); and (3) that Ocean Spray retaliated against certain plaintiffs in violation of Massachusetts General Laws chapter 93A, § 11 (Count III).  Docket # 253, at 21–26.  Ocean Spray moves for summary judgment on Counts I and II.  Docket # 254.  A number of plaintiffs move for partial summary judgment on Count I.  Docket # 260.  Ocean Spray moves to defer or deny plaintiffs' Motion for Partial Summary Judgment.  Docket # 268.

## I.    Background

As relevant to the instant motions, the cranberry industry is composed of three groups: growers, handlers, and consumers.  Growers produce raw cranberries.  Handlers process raw cranberries into consumer products (such as juice and sweetened dried cranberries) and commodity ingredients (such as cranberry concentrate or frozen cranberries).  They then sell the resulting products.  Consumers are either households or food processing companies.

Ocean Spray, a cooperative comprised of more than 700 grower members,[2] is the largest cranberry handler in North America.  It sells both branded cranberry products, including Craisins® and Ocean Spray beverages, and unbranded commodity ingredients, including cranberry concentrate.  The Ocean Spray cooperative divides

---

[2]        Plaintiffs contend that Ocean Spray should not be considered an agricultural cooperative because it does not attempt to maximize returns for all of its members.  See Docket # 283, at 2.  Rather, plaintiffs maintain that Ocean Spray is a "Consumer Products Company."  Id.  Because Ocean Spray has cooperative marketing agreements with its growers, under which growers deliver fruit and Ocean Spray agrees to market 100% of the fruit, I refer to Ocean Spray as a cooperative, regardless of whether Ocean Spray does indeed try to maximize profits for all of its members.  Further, Ocean Spray maintains it is a qualified cooperative under Subchapter T of the Internal Revenue Code.

growers into two "pools":  the A Pool and B Pool.  Both pools deliver raw cranberries to Ocean Spray.  A Pool growers deliver fruit that is largely used for Ocean Spray's branded products for which they receive a share of the net proceeds arising from these products; B Pool growers deliver cranberries and then receive a share of Ocean Spray's net proceeds from its resulting unbranded commodity ingredients.

Growers outside of the Ocean Spray cooperative ("independent growers") deliver cranberries to "independent handlers."  These handlers generally purchase the cranberries from the growers for a specific price, though the price may not be agreed at the time the growers deliver the fruit.  One independent handler, Cranberries Limited, Inc. ("CLI"), has a Toll Processing Agreement ("TPA") with Ocean Spray.  Under the TPA, Ocean Spray processes CLI's cranberries into concentrate at an Ocean Spray facility for a fee.  Ocean Spray then returns the concentrate to CLI who markets it.  The TPA provides that Ocean Spray will buy back whatever concentrate CLI cannot sell.

Beginning in 2009, Ocean Spray began selling concentrate through auctions.  At these auctions, Ocean Spray offers a fixed amount of concentrate at a given price, and buyers submit bids for a given volume at that price.  If the total volume of concentrate bids exceed the volume offered at the auction, the auctioneer raises the price, and the buyers submit new bids.  This process continues until the aggregate volume of the bids is less than or equal to the volume of concentrate offered at the auction.  At this point, each buyer purchases its bid volume at the auction's closing price.

On October 27, 2012, "John Doe Growers 1–7" and "John Doe B Pool Grower 1" filed a putative class action with seven counts against Ocean Spray.  Docket # 1.  The

procedural history of the case since then is lengthy and involved.  To summarize, plaintiffs amended their complaint a number of times, adding, inter alia, named plaintiffs and additional counts.  See Docket ## 28, 29, 34, 44.  Ocean Spray moved to dismiss all counts, Docket # 47, a motion I allowed in part and denied in part, Docket # 78. Subsequently, plaintiffs sought partial summary judgment on two of the remaining counts, Docket # 102, and Ocean Spray moved for summary judgment on all remaining counts, Docket # 115.  I denied plaintiffs' motion, and I allowed Ocean Spray's motion in part and denied it in part, allowing three of plaintiffs' claims to go forward.  Docket # 143.

Plaintiffs moved to certify a proposed class of "[a]ll domestic independent cranberry farmers and all B-Pool members of Ocean Spray who received payment during the period August 2009 to the present for cranberries delivered to a handler for the purpose of processing the cranberries into concentrate."  Docket # 195.  I denied their motion on May 10, 2016.  Docket # 222.  Following the denial of class certification, plaintiffs further amended their complaint, ultimately resulting in the current Fourth Amended Complaint.  Docket # 253.

## II.    Standard

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is 'genuine' for purposes of summary judgment if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'"  Poulis-Minott v. Smith, 388 F.3d 354, 363 (1st Cir. 2004)

(quoting <u>Hayes v. Douglas Dynamics, Inc.</u>, 8 F.3d 88, 90 (1st Cir. 1993)).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Ferguson v. Gen. Star Indem. Co.</u>, 582 F. Supp. 2d 91, 98 (D. Mass. 2008) (quoting <u>Adria Int'l Grp., Inc. v. Ferré Dev., Inc.</u>, 241 F.3d 103, 107 (1st Cir. 2001)). "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." <u>Id.</u> (quoting <u>Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc.</u>, 761 F. Supp. 194, 197–98 (D. Mass. 1991)).

## III. Ocean Spray's Motion for Summary Judgment

Ocean Spray moves for summary judgment on Counts I and II of plaintiffs' Fourth Amended Complaint. I begin with Count II, the federal claim in this case.

### A. Count II – Violation of the Sherman Act, 15 U.S.C. § 2

In Count II, plaintiffs allege Ocean Spray violated section 2 of the Sherman Act, 15 U.S.C. § 2, by attempting "to monopsonize the relevant cranberry market by fixing the prices of fresh and processed cranberries to harm the Plaintiffs." Docket # 253, at ¶ 73.[3] They claim Ocean Spray began engaging in "anticompetitive schemes in 2009," when it started the auction. <u>Id.</u> at ¶ 34; <u>see also</u> <u>id.</u> at ¶ 59. At the first auction, plaintiffs maintain, Ocean Spray set the opening price "at a level significantly lower than the price

---

[3] As explained in my 2015 Memorandum of Decision, monopsonization describes consolidation of a market into one buyer, and like monopolization, is a violation of section 2 of the Sherman Act. Docket # 143, at 8.

for cranberry juice concentrate that existed at that time in the unrestrained market." Id. at ¶ 64; see also Docket # 44-2, at 38. Ocean Spray then set the opening bid at the next auction lower than the final bid from the previous auction. Docket # 253, at ¶ 65.[4]

Plaintiffs allege that through this auction, Ocean Spray "creates an artificially low market price" for cranberry juice concentrate. Id. at ¶ 56. This is because, plaintiffs claim, the auction "sets the price for cranberry juice concentrate for the industry." Id. at ¶ 63. Accordingly, by setting a low concentrate price at the auction, Ocean Spray "unlawfully suppress[es] the market price of cranberries grown both by independent growers and by Ocean Spray's own 'B Pool' of cranberry growers." Id. at 3. Plaintiffs maintain that Ocean Spray "creat[ed] a second-class membership within the cooperative, the 'B Pool,' and discriminat[ed] against them by returning a lower value for their fruit than that received by the dominant and controlling members of the cooperative, the 'A Pool.'" Id. at 4.[5]

As to the motivation for such a scheme, plaintiffs claim that Ocean Spray engaged in these "activities in order (1) to prevent its grower members from leaving Ocean Spray's cooperative in search of a fairer price for their crop; and (2) to force independent growers either to go out of business or to become members of Ocean Spray's cooperative." Id. at 3. Specifically, plaintiffs maintain that "[t]his price-fixing has

---

[4]     Plaintiffs also allege that prior to each auction, Ocean Spray requires bidders to submit an application that includes the amount of concentrate sought. Ocean Spray then tells the individual bidders on how much concentrate they are allowed to bid. After the auction closes, plaintiffs claim, Ocean Spray sells bidders additional concentrate.

[5]     In their complaint, plaintiffs allege that "[t]he Board is dominated by A Pool growers — eight of the thirteen member-directors have exclusively A Pool acreage. The five remaining member-directors have acres in the A Pool and the B Pool and all have a sizable majority in the A Pool." Docket # 253, at ¶ 30.

solidified the Defendant's market dominance, discouraging the 'B Pool' growers from leaving the cooperative, and leaving independent growers with no choice but to either exit the cranberry market altogether or to join Ocean Spray at a significant financial disadvantage as members of its disfavored and underpaid 'B Pool.'" Id. at 5. This ultimately benefits the A pool, plaintiffs say, because the "low price, for predominantly all growers outside of the A Pool, creates a desire to return to or be part of the A Pool," which in turn, "enhances the amount of fruit available to Ocean Spray branded products and creates a monopsony power as Ocean Spray is the exceedingly dominant handler." Id. at ¶ 56. Further, when independent growers leave the market, plaintiffs allege, A pool members can "purchase the independent growers' cranberry bogs at prices far below the value that would have existed in the absence of Defendant's illegal tactics." Id. at ¶ 37. Plaintiffs also suggest that the auction allows Ocean Spray "to obtain additional supplies of cranberries at artificially depressed prices." Docket # 281, at 6; see also Docket # 253, at ¶ 48; Docket # 278, at 12.

Plaintiffs bring their claim for damages under section four of the Clayton Act, which allows "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" to bring suit. See 15 U.S.C. § 15(a). Ocean Spray moves for summary judgment on the basis that plaintiffs lack standing to bring an antitrust claim.[6] Plaintiffs include B pool growers, non-CLI independent growers, and

---

[6] Ocean Spray has previously moved for summary judgment on this basis, see Docket # 115, and I denied its motion with respect to plaintiffs' monopsonization count, Docket # 143, at 13. Ocean Spray maintains that "[s]ince that time, the parties have undertaken discovery that establishes, beyond dispute, that [plaintiffs'] allegations are not true." Docket # 255, at 9. In addition, Ocean Spray relies on recent case law from the Second Circuit, which Ocean Spray claims "makes clear that plaintiffs here lack antitrust injury in addition to alleging injuries that are too remote." Id. at 9–10.

Ocean Spray also moves for summary judgment on the basis that "as a matter of

CLI growers.  I discuss each group's standing separately.[7]

### 1. The B Pool Growers

"Despite the broad language of § 4, the Supreme Court has held that § 4 of the Clayton Act does not 'allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.'" Serpa Corp. v. McWane, Inc., 199 F.3d 6, 9 (1st Cir. 1999) (quoting Blue Shield of Va. v. McCready, 457 U.S. 465, 477 (1982)).  "Instead, the Court has created a comprehensive antitrust standing doctrine to determine which persons are entitled to bring suit under the federal antitrust statutes." Id. at 10.  Accordingly, to bring a claim under the Clayton Act, a plaintiff must establish not only harm but also that he or she "is a proper party to bring a private antitrust action." Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC"), 459 U.S. 519, 535 n.31 (1983); see also SAS of P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39, 43 (1st Cir. 1995) ("[E]ven where a violation exists and a plaintiff has been damaged by it, the courts — for reasons of prudence — have sought to limit the right of private parties to sue for damages or injunctions.").

---

economic reality," it cannot be a monopsonist because it is not a "buyer" of cranberries but rather gives the growers proceeds from the products it sells.  Docket # 255, at 22–23.  Here, the nature of the alleged conspiracy is that Ocean Spray allegedly artificially depressed concentrate prices at least in part to generate lower returns for B pool growers.  That is, it allegedly functioned as a purchaser of cranberries, compensating growers using the proceeds from the auction.  Whether plaintiffs will ultimately prevail on their theory at trial, absent case law to support Ocean Spray's contention, Ocean Spray is not entitled to summary judgment on this issue.

[7]    At the July 13, 2017, hearing, Ocean Spray maintained that there were no B pool growers left in the case, notwithstanding that plaintiffs' Fourth Amended Complaint includes two B pool growers as plaintiffs.  Ocean Spray has provided no evidence that these plaintiffs are not B pool growers or explanation of why their claims are no longer relevant.  Accordingly, I analyze whether these B pool growers have standing.

When determining "whether a plaintiff has standing to bring an antitrust action," Serpa, 199 F.3d at 10, courts consider six factors set forth in AGC:

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

Id. (citing AGC, 459 U.S. at 537–45). I begin with the third factor, "antitrust injury," as "[t]he existence of antitrust injury is a central factor in the standing calculus," Sullivan v. Tagliabue, 25 F.3d 43, 47 (1st Cir. 1994); see also Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 110 n.5 (1986) (noting that "[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4").

"Antitrust injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Sterling Merch., Inc. v. Nestlé, S.A., 656 F.3d 112, 121 (1st Cir. 2011) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). "The harm 'should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.'" Serpa, 199 F.3d at 10 (quoting Brunswick, 429 U.S. at 489).

Ocean Spray maintains that plaintiffs cannot establish an antitrust injury as a matter of law because they are not participants in the market where the alleged manipulation occurred. Specifically, Ocean Spray argues that plaintiffs complain that the manipulation occurred in the handler–consumer concentrate market through the auction, while plaintiffs' alleged injury occurred in the grower–handler market. Accordingly, Ocean Spray claims that any injury plaintiffs suffer "is merely 'collateral damage' flowing

9

out of alleged anticompetitive conduct in a market in which plaintiffs do not participate."
Docket # 255, at 13.

To be clear, as I explained in my 2015 decision, the relevant claim here is one for monopsonization, the consolidation of a market into one buyer.  <u>See</u> Docket # 143, at 8, 11 n.7.  The claim is that Ocean Spray, as a "buyer,"[8] fixed the price of fruit below the market price and below the growers' cost of production.  <u>See</u> Docket # 253, at ¶ 24. This is a distinct claim from plaintiffs' monopolization claim: that Ocean Spray — as a handler or seller — fixed the price of concentrate.  I allowed Ocean Spray's motion for summary judgment on the monopolization claim in 2015; it is no longer before me.  For purposes of plaintiffs' monopsonization claim, suppliers (such as the B pool growers) walk in the same shoes as customers in a traditional monopolistic market.  Docket # 143, at 11.  And consumers in the monopolistic market are among the "presumptively . . . proper plaintiffs to allege antitrust injury."  <u>Serpa</u>, 199 F.3d at 10. Therefore, at least the B pool growers, as suppliers, would presumptively have standing to pursue their monopsony claim.  Ocean Spray's assertion seems to be that because the amount of proceeds it gives its growers is directly tied to the auction price for concentrate, and the auction takes place in a different market, the growers should not have standing.  I find this argument unpersuasive.

In <u>Blue Shield of Virginia v. McCready</u>, the Supreme Court addressed the argument that a plaintiff should not have standing when "she was not an economic actor in the market that had been restrained."  457 U.S. at 479.  There, the plaintiff received

---

[8]     <u>See</u> <u>supra</u> note 6.

health care coverage under a Blue Shield of Virginia ("Blue Shield") health plan.  Id. at 467–68.  The plan reimbursed subscribers for psychotherapy that was administered by a psychiatrist, but it did not provide reimbursement when such treatment was provided by a psychologist unless the therapy "was supervised by and billed through a physician." Id. at 468.  The plaintiff, who had been treated by a psychologist and whose claims were routinely denied, brought a class action against Blue Shield and the Neuropsychiatric Society of Virginia, Inc., alleging they had engaged in a conspiracy to exclude psychologists from receiving compensation under the health plan.  Id. at 468–70.

The defendants in McCready claimed that the relevant market was "the market in group health care plans," and as such, standing should be "limited to participants in that market — that is, to entities, such as [the plaintiff]'s employer, who were purchasers of group health plans, but not to [the plaintiff] as a beneficiary of the Blue Shield plan."  Id. at 479–80.  The Supreme Court rejected this argument.  It explained that the plaintiff did "not allege a restraint in the market for group health plans."  Id. at 480.  Rather, the Court said, the plaintiff's "claim of injury is premised on a concerted refusal to reimburse under a plan that was, in fact, purchased and retained by her employer for her benefit, and that as a matter of contract construction and state law permitted reimbursement for the services of psychologists without any significant variation in the structure of the contractual relationship between her employer and Blue Shield."  Id.  With regard to the contention that the plaintiff's injury did "not reflect the 'anticompetitive' effect of the alleged boycott," id. at 481, the Court held that the plaintiff's injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market," id. at 484.  It reasoned that "[i]n light of the [alleged] conspiracy,"

11

the plaintiff's "injury 'flows from that which makes defendants' acts unlawful' . . . and falls squarely within the area of congressional concern," id. at 484 (quoting Brunswick, 429 U.S. at 489).

The First Circuit has suggested that while McCready "may be an instance in which standing was extended to a plaintiff who was only derivatively injured," it "can also be read as a case in which the plaintiff was a purchaser in the very market directly distorted by the antitrust violation." SAS, 48 F.3d at 45–46. Further, the First Circuit found it "doubtful" that the "inextricably intertwined" language in McCready — "if taken as [a] physical image — was ever intended as a legal test of standing." Id. at 46. However, even employing a narrow reading of McCready, I find that for purposes of avoiding summary judgment, B pool plaintiffs have established a potential antitrust injury. Insofar as it relates to their monopsonization claim, plaintiffs appear to be alleging that Ocean Spray used the auction to fix the returns B pool growers received for their fruit, Docket # 253, at ¶¶ 24(c), 73, at least in part so that growers would want to join (or stay in) the A pool, id. at ¶ 63; Docket # 281, at 6. Accordingly, for purposes of their monopsonization claim, the plaintiffs can contend that they participated "in the very market directly distorted by the antitrust violation," SAS, 48 F.3d at 46.

Nonetheless, Ocean Spray maintains that because the auction, which is the means by which it allegedly fixed cranberry prices, occurred in the handler–consumer market, the growers cannot show antitrust injury in the grower–handler market. It relies in part on a case from the Second Circuit, In re Aluminum Warehousing Antitrust Litigation, which held that "to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained," 833 F.3d 151, 161 (2d Cir.

12

2016). In <u>Aluminum Warehousing</u>, purchasers of fabricated and semi-fabricated aluminum alleged that aluminum traders and their warehouse operator affiliates conspired to cause an artificial increase in the cost of storing aluminum in London Metal Exchange ("LME") Warehouses. <u>Id.</u> at 155. The increase in storage cost caused the price plaintiffs paid for aluminum to increase as well. <u>Id.</u> at 156. The Second Circuit held that the commercial and consumer end users of aluminum did not have standing because, inter alia, they did not participate in the allegedly restrained LME-warehouse storage market. <u>Id.</u> at 162. Rather, the Second Circuit explained, "the injury [the plaintiffs] claim was suffered down the distribution chain of a separate market, and was a purely incidental byproduct of the alleged scheme." <u>Id.</u>[9]

I have doubts as to whether <u>Aluminum Warehousing</u> would necessarily resolve the instant inquiry in Ocean Spray's favor. In <u>Aluminum Warehousing</u>, the Second Circuit explained that the defendants in <u>McCready</u> "could not achieve their illegal ends . . . without injuring participants in some other market," and as such, "[u]nless the market dynamics force conspirators to corrupt a separate market to achieve their illegal ends, potential <u>McCready</u> plaintiffs do not arise." <u>Id.</u> at 163; <u>see also</u> <u>id.</u> at 161 ("[S]ometimes the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target."); <u>In re: London Silver Fixing, Ltd., Antitrust Litig.</u>, 213 F. Supp. 3d 530, 551 (S.D.N.Y. 2016) (explaining that under <u>Aluminum Warehousing</u>, "plaintiffs in an

---

[9]       Relying on this decision and its reasoning, the district court later held that first level purchasers of aluminum did not suffer an antitrust injury either. <u>In re Aluminum Warehousing Antitrust Litig.</u>, No. 13-md-2481 (KBF), 2016 WL 5818585, at *1, *8 (S.D.N.Y. Oct. 5, 2016); <u>see also</u> <u>Agfa Corp. v. Goldman Sachs Grp., Inc.</u>, No. 14-cv-0211 (KBF), 2016 WL 7009031, at *6 (S.D.N.Y. Nov. 30, 2016).

affected secondary market may have antitrust standing if their alleged injuries are
'"inextricably intertwined" with the injury the defendants ultimately sought to inflict' and if
their injuries are 'the essential means by which defendants' illegal conduct brings about
its ultimate injury to the marketplace'" (quoting <u>Aluminum Warehousing</u>, 833 F.3d at
161)).

Here, as discussed, the allegation seems to be that the auction was necessary to
restrain the grower–handler market; the price paid to the B pool is directly tied to the
auction price. Plaintiffs allege, "[t]he auction is a sham; it is nothing more than a guise
for Ocean Spray to predatorily set cranberry prices below the cost of production."
Docket # 253, at 4. Understood this way, Ocean Spray needed "to corrupt [the
concentrate] market to achieve [its] illegal ends," <u>Aluminum Warehousing</u>, 833 F.3d at
163. In any event, <u>Aluminum Warehousing</u> is not the law in this circuit, and as such, it
cannot on its own determine the outcome here.

The remaining <u>AGC</u> factors weigh in favor of finding the B pool growers have
standing. They allege harm directly resulting from the lower returns they received, and
the motive for illegally fixing the price, plaintiffs suggest, is to enrich the A pool at the B
pool's expense. There exist genuine disputes of material fact with regard to these
issues. Further, at least for the B pool, there seems to be little risk for duplicative
recovery or complex apportionment of damages. Therefore, Ocean Spray's motion for
summary judgment on Count II is DENIED with regard to the B pool growers.

### 2. The Non-CLI Independent Growers

The independent grower plaintiffs also allege they suffered harm as a result of the
auction. These growers claim that by manipulating the price of concentrate, Ocean

Spray causes independent handlers to pay independent growers prices below the cost of production for their fruit. The chain of events seems to be that the auction price of Ocean Spray's concentrate sets the price at which independent handlers sell their concentrate. Then, the price at which independent handlers sell their concentrate determines the price independent handlers pay independent growers for their fruit. See Docket # 282-14, at 4–8, 13–17; see also Docket # 282-15, at 5–7, 9–21, Docket # 282-16, at 4.

Assuming for purposes of this motion, these growers did suffer antitrust injury, they must still demonstrate that this injury is sufficiently connected to Ocean Spray's alleged violation. See AGC, 459 U.S. at 536 ("It is common ground that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing."). Some injuries "are too remote from the violation and the purposes of the antitrust laws to form the predicate for a suit under § 4," McCready, 457 U.S. at 477. Accordingly, I must "evaluate the plaintiff[s'] harm, the alleged wrongdoing by the defendants, and the relationship between them." AGC, 459 U.S. at 535. The factors delineated in AGC guide this task, id. at 537, with the ones most relevant to this case being the first, fourth, and fifth: the "causal connection between [the] antitrust violation and harm," id.; "the directness or indirectness of the asserted injury," id. at 540; and the "speculative" nature of the damages claim, id. at 542.

Considering these factors, I conclude that the even if the independent growers' suffered antitrust injury, they cannot establish antitrust standing. First, the harm they allege is indirect: Ocean Spray first influences independent handlers, who in turn, lower the prices they pay independent growers. See AGC, 459 U.S. at 530 n.19 (explaining

15

that even in cases that employed "broad language" in construing § 4 of the Clayton Act, "the actual plaintiff was directly harmed by the defendants' unlawful conduct").[10]

Further, "[t]he outcome of any attempt to ascertain what price the defendants' competitors would have [paid each independent grower] had there not been [an auction] would at the very least be . . . conjectural." Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc., 596 F.2d 573, 584 (3d Cir. 1979); cf. McCready, 457 U.S. at 475 n.11 ("If there is a subordinate theme to our opinions in Hawaii [v. Standard Oil Co. of Cal., 405 U.S. 251 (1972)] and Illinois Brick [Co. v. Illinois, 431 U.S. 720 (1977)], it is that the feasibility and consequences of implementing particular damages theories may, in certain limited circumstances, be considered in determining who is entitled to prosecute an action brought under § 4").

Plaintiffs acknowledge that the concentrate auction is one of "[a] variety of factors [that] have influenced the prices that independent handlers have paid independent growers for cranberries."  Docket # 283, at ¶ 28.  This is particularly so for those growers who sell to handlers that sell products other than concentrate or juice, and thus have even less of a connection to Ocean Spray's auction prices.  Plaintiffs posit a link

---

[10]         Plaintiffs seem to be making, albeit obliquely, an argument for "a so-called 'umbrella theory' of liability," In re: London Silver Fixing, Ltd., 213 F. Supp. 3d at 554.  "Umbrella standing concerns are most often evident when a cartel controls only part of a market, but a consumer who dealt with a non-cartel member alleges that he sustained injury by virtue of the cartel's raising of prices in the market as a whole."  Id. at 554–55 (quoting Gelboim v. Bank of Am. Corp., 823 F.3d 759, 778 (2d Cir. 2016), cert. denied, 137 S. Ct. 814 (2017)).  "The antitrust standing of umbrella purchasers under such circumstances has produced a split in authority among" circuit courts, Gelboim, 823 F.3d at 778 (collecting cases), as well as district courts, see Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 991 n.9 (9th Cir. 2000) (collecting cases).  I need not resolve the issue here because under the facts of this case, such a theory would not be appropriate for the independent growers.  Specifically, given that the independent growers' theory implicates transactions in two markets, see Docket # 253, at ¶ 42, the challenges in assessing harm under these circumstances, and the ability of better positioned plaintiffs to bring a claim, I conclude the independent growers do not have antitrust standing here, whatever the merits of umbrella standing in other cases.

between concentrate prices and raw cranberry prices. <u>See</u> Docket # 253, at ¶ 14. However, even if there is a connection between the two, there is still some flexibility with regard to grower payments based on sales of other products and rates paid by other handlers. <u>See</u> Docket # 280-14, at 22.

Finally, under the facts of this case, the B pool growers, and as discussed below, the CLI growers, having allegedly suffered more direct harm from the auction, would be better positioned to bring a claim. <u>See</u> <u>AGC</u>, 459 U.S. at 542 ("The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general."); <u>Gelboim v. Bank of Am. Corp.</u>, 823 F.3d 759, 779 (2d Cir. 2016), <u>cert. denied</u>, 137 S. Ct. 814 (2017) ("Implicit in the inquiry is recognition that not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced."). These factors lead to the conclusion that the independent growers are not the "proper party to bring a private antitrust action," <u>AGC</u>, 459 U.S. at 535 n.31, and as such they do not have antitrust standing.[11] Ocean Spray's motion for summary judgment on Count II is ALLOWED with respect to the non-CLI independent growers.

### 3. The CLI Growers

The CLI growers are a specific subset of independent growers, who in some ways

---

[11]     In my 2015 decision, I held that these plaintiffs were "well situated to pursue this antitrust claim." Docket # 143, at 12. Since that time, however, the discovery produced, taken most favorably to plaintiffs, has shown that as a matter of law, these plaintiffs do not have antitrust standing.

are similarly positioned, yet in others are quite distinct. Specifically, under the TPA, Ocean Spray processes CLI's fruit into concentrate and returns it to CLI (a handler). Ocean Spray is then obligated to purchase concentrate that CLI is unable to sell.

At least one CLI-grower plaintiff has a Crop Purchase Agreement with CLI under which the grower "sell[s] and deliver[s] to CLI 100% of the cranberries grown by or for the Grower from the cranberry-producing acreage described [in the agreement], . . . except that Grower may retain for its use or sale to third parties up to but no more than 500 Barrels . . . curing [sic] any crop year." Docket # 256-33, at 2. In this agreement, the price the CLI grower receives for its fruit is "the weighted average price per gallon paid by Ocean Spray to CLI during the preceding month for concentrate purchased by Ocean Spray under the Tolling Agreement multiplied by 1.66" minus the processing fee CLI pays to Ocean Spray. Id. Ocean Spray disputes whether all CLI growers have identical agreements. See Docket # 285, at 12.

The CLI grower plaintiffs maintain that Ocean Spray, as a purchaser of CLI concentrate, harms them because the price Ocean Spray pays CLI for concentrate is essentially the artificially depressed auction price, which then determines the price the growers receive. They further contend there is evidence suggesting Ocean Spray purchases not only concentrate but also raw fruit from CLI. See, e.g., Docket # 280-2. Regardless of the likelihood of the success of the CLI plaintiffs, as indirect sellers to Ocean Spray on their monopsony claim at trial, there is at least enough in the record to create a genuine issue of material fact as to prevent summary judgment for Ocean Spray. See, e.g., Docket # 267-38, at 148–49, Docket # 280-1, at 6.

Ocean Spray contends that the CLI grower plaintiffs' claims are barred by Illinois

Brick because these plaintiffs do not sell directly to Ocean Spray.  See Ill. Brick, 431 U.S. at 730–36 (holding that indirect purchasers generally do not have antitrust standing); Zinser v. Cont'l Grain Co., 660 F.2d 754, 760–61 (10th Cir. 1981) (applying Illinois Brick to indirect sellers).  I explained why Illinois Brick did not apply to the independent growers in my 2015 decision, see Docket # 143, at 12–13, and Ocean Spray offers no explanation of what evidence has been produced since then such that I should change my decision.  I add only that the evidence at this stage creates at least an issue of fact as to whether, if Illinois Brick applied, these growers would fall under the exception for "a pre-existing cost-plus contract," Ill. Brick, 431 U.S. at 736.  The Supreme Court explained, "[i]n such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price.  The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case."  Id.; cf. In re Beef Indus. Antitrust Litig., MDL Docket No. 248, 600 F.2d 1148, 1163–5 (5th Cir. 1979) (applying this exception in a case with indirect sellers).

Here, there is evidence suggesting that at least one CLI grower sells nearly 100% of its fruit to CLI, and Ocean Spray commits to buying any excess concentrate from CLI.  Further, the price CLI pays for the cranberries is directly determined by the price it receives from Ocean Spray.  Thus, there is at least an issue of material fact as to whether "the direct [seller] will bear no portion of the [under]charge and otherwise suffer no injury," Kansas v. UtiliCorp United Inc., 497 U.S. 199, 218 (1990).  Ocean Spray's motion for summary judgment on Count II is DENIED with respect to the CLI plaintiffs.

19

**B.     Count I – Massachusetts General Laws chapter 93A, § 11**

In Count I, the independent growers allege that Ocean Spray's actions constitute unfair and deceptive acts in violation of Massachusetts General Laws chapter 93A, § 11. Ocean Spray moves for summary judgment on the basis that the independent growers are not in a business relationship with Ocean Spray and that the non-Massachusetts plaintiffs lack a sufficient connection to Massachusetts.

Ocean Spray previously sought summary judgment on the 93A count.  See Docket # 128, at 16–24.  In my 2015 decision, I rejected its arguments and denied summary judgment with respect to the 93A claims.  See Docket # 143, at 16–19, 23.  I explained that plaintiffs pleaded their 93A claim broadly, alleging numerous facts in support.  Docket # 143, at 16–17. Ocean Spray makes no argument as to how the evidence since my 2015 decision has changed such that I should reconsider it.

Accordingly, Ocean Spray's motion for summary judgment on Count I is denied — with one qualification.  In light of the allowance of summary judgment on Count II with respect to the non-CLI independent growers, these growers can no longer bring a 93A claim based on antitrust violations.

For antitrust claims brought under Chapter 93A, § 11, "the court shall . . . be guided in its interpretation of unfair methods of competition by those provisions of chapter ninety-three known as the Massachusetts Antitrust Act."  Mass. Gen. Laws ch. 93A, § 11.  And the Massachusetts Antitrust Act provides that it "shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable."  Mass Gen. Laws ch. 93, § 1.  As the foregoing analysis of standing under

federal law demonstrates, the independent growers do not have standing to bring an antitrust claim.  Construing the Massachusetts Antitrust Act harmoniously with federal antitrust law would dictate that these plaintiffs lack standing under Massachusetts antitrust law as well, and so they cannot bring a § 11 claim that is premised on an antitrust violation.  Cf. Ciardi v. F. Hoffmann-La Roche, Ltd., 762 N.E.2d 303, 311–12 (Mass. 2002) (implying that because Illinois Brick generally precludes indirect purchasers from bringing federal antitrust claims, such plaintiffs could not bring a claim under Chapter 93A, § 11); In re Asacol Antitrust Litig., No. 15-cv-12730-DJC, 2016 WL 4083333, at *13 (D. Mass. July 20, 2016) (concluding that indirect purchaser plaintiffs cannot bring an antitrust claim under § 11).

Accordingly, summary judgment is ALLOWED on Count I only insofar as the non-CLI independent growers' 93A claim is based on Ocean Spray's alleged attempted monopsonization and monopsonization.  As to what remains of the independent growers' 93A claim, summary judgment is DENIED.

## IV.    Plaintiffs' Motion for Partial Summary Judgment

CLI growers Charles V. Goldsworthy, Timothy R. Goldsworthy, ThunderLake-Tomahawk Cranberries, Inc., H.E. Querry, Inc., Timothy R. Goldsworthy and Charles V. Goldsworthy, Trustees of the Elizabeth Goldsworthy Trust, and Hungry Run Cranberry, LLC, K&S Cranberries, Kevin Griffin, and Sue Griffin move for partial summary judgment on their 93A claim.

Plaintiffs previously brought a motion for partial summary judgment, see Docket # 102, which I denied because questions of material fact remained.  This included questions as to the fairness of the auction and any causal connection to plaintiffs'

harms, Docket # 143, at 21–22.  These disputes remain.  The CLI plaintiffs' motion is DENIED.

## V.    Conclusion

Ocean Spray's Motion for Summary Judgment on Counts I and II of Plaintiffs' Fourth Amended Complaint (Docket # 254) is ALLOWED IN PART and DENIED IN PART.  Plaintiffs' Motion for Partial Summary Judgment (Docket # 260) is DENIED, and, to that extent, Ocean Spray's Motion to Defer or Deny Plaintiffs' Motion for Partial Summary Judgment (Docket # 268) is ALLOWED.

Plaintiffs shall provide an accurate list of the plaintiffs who remain at this juncture and shall articulate the jurisdictional basis for remaining claims.


_____October 31, 2017_____            _____/s/Rya W. Zobel_____

DATE                                                          RYA W. ZOBEL
                                                    UNITED STATES SENIOR DISTRICT JUDGE